## UNITED STATES *v.* READING COMPANY ET AL.

## READING COMPANY ET AL. *v.* UNITED STATES.

APPEALS FROM THE DISTRICT COURT OF THE UNITED STATES FOR THE EASTERN DISTRICT OF PENNSYLVANIA.

Nos. 3, 4. Argued October 10, 11, 1916; restored to docket for reargument May 21, 1917; reargued November 20, 21, 1917; restored to docket for reargument June 10, 1918; reargued October 7, 1919.—Decided April 26, 1920.

Regardless of the use made of it, a power resulting, not from normal expansion and legitimate business enterprise, but from deliberate calculated purchase for control, which enables a holding company to dominate two great competing interstate railroad carriers and two great competing coal companies, engaged extensively in mining and selling anthracite coal that must be transported to interstate markets over those railroads, is a menace to and an undue restraint upon interstate commerce within the meaning of the Anti-Trust Act. P. 57.

By a scheme of reorganization executed after the enactment of the

Sherman Anti-Trust Act, all the property of the Philadelphia &
Reading Coal & Iron Company, a large producer of anthracite coal,
controlling about two-fifths of the supply in the largest of the three
fields in Pennsylvania where substantially all of the anthracite of
the country is found, and all the property of the Philadelphia & Read-
ing Railroad Company, owner of all the capital stock of the Coal
Company and of an extensive railroad system over which that
company's large output found its way to interstate markets, was
delivered into the complete control of the Reading Company. That
company became the owner of all the stock of the Coal Company,
with additional control over it through fiscal provisions of the
reorganization; of all the stock of a new railroad company, the
Philadelphia & Reading Railway Company, to which the main rail-
road was transferred; of all the equipment for operating the rail-
road, and of ships, terminals, short lines and other property which
formed part of the railroad system. Besides entering into two
schemes with other carriers and coal companies for suppressing
competition, which were declared violations of the Anti-Trust
Act in *United States* v. *Reading Co.*, 226 U. S. 324 (see *infra*,
p. 49), the Reading Company purchased a controlling interest
in the capital stock of the Central Railroad Company of New
Jersey—a large carrier of anthracite in competition with the Phila-
delphia & Reading Railway Company, and owner of over eleven-
twelfths of the capital stock of the defendant Lehigh & Wilkes-
Barre Coal Company, which in turn owned or had leased a very
large acreage in another of the Pennsylvania anthracite fields, and
was a competitor of the Philadelphia & Reading Coal & Iron Com-
pany; and thereby, and through common officers and directors, the
Reading Company acquired and exercised active dominating control
over the last two-mentioned companies, its power thus including
two of the principal competing producers and two of the principal
competing initial carriers, of anthracite, in interstate commerce.
There was evidence also of its combining with other carriers to fix
excessive flat rates to tidewater, and of special privileges extended
by it to the Philadelphia & Reading Coal & Iron Company in the
way of financial assistance and forbearance, and of similar dealing
between the Central Railroad and Wilkes-Barre Companies.

*Held*, that the combination both before and after the induction of the
Central Railroad Company of New Jersey violated the Sherman
Anti-Trust Act, and that the relations between the Reading Com-
pany, the Philadelphia & Reading Railway Company, the Philadel-
phia & Reading Coal & Iron Company and the Central Railroad

Company of New Jersey must be so dissolved as to give to each of them a position in all respects independent and free from stock or other control of any of the others. Pp. 43–59.

The combination between the Philadelphia & Reading Railway Company and the Philadelphia & Reading Coal & Iron Company through the Reading Company must also be dissolved, because the transportation thereunder by the Railway of the coal produced by the Coal Company, violates the commodities clause of the Act of June 29, 1906. P. 60.

While the ownership by a railroad company of shares of the capital stock of a mining company does not necessarily create an identity of corporate interest between the two such as to render it unlawful under the commodities clause for the railroad company to transport in interstate commerce the products of such mining company, yet where such ownership of stock is resorted to, not for the purpose of participating in the affairs of the corporation in which it is held in a manner normal and usual with stockholders, but for the purpose of making it a mere agent, or instrumentality or department of another company, the courts will look through the forms to the realities of the relation between the companies as if the corporate agency did not exist and will deal with them as the justice of the case may require. P. 62.

Applying this rule, *held*, that the relation between the Central Railroad Company of New Jersey and the Lehigh & Wilkes-Barre Coal Company, with the former owning over eleven-twelfths of the capital stock of the latter and using the latter as the coal mining department of its organization, violates the commodities clause, and for that reason must be dissolved. *Id.*

In 1871, the Lehigh Coal & Navigation Company, owner of extensive coal-producing properties and of the Lehigh & Susquehanna Railroad, leased the railroad for a rental of one-third of its gross earnings to the Central Railroad Company of New Jersey, the line leased and the line of the lessee not being in competition but the one forming a natural extension of the other into the coal fields. *Held*, that a covenant in the lease, assumed to require the lessor to ship to market over the leased line three-fourths of all the coal which it should produce in the future, was not designed to suppress interstate commerce, did not have that effect, and does not violate the Anti-Trust Act. P. 54.

Covenants in leases of coal lands by the Philadelphia & Reading Coal & Iron Company and Lehigh & Wilkes-Barre Coal Company, obliging the lessees to ship all coal mined by rail routes

designated or to be designated, are *held* unlawful as part of the scheme to control the mining and transportation of coal herein condemned, and their enforcement is enjoined. P. 55.

As to other charges against the Lehigh Coal & Navigation Company, and as respects the Wilmington & Northern Railroad Company, the Lehigh & Hudson River Railway Company, the Lehigh & New England Railroad Company, and the surviving individual defendants, the bill is dismissed without prejudice. *Id.*

226 Fed. Rep. 229, affirmed in part, reversed in part.

THE case is stated in the opinion. Motions to modify the decree were made and denied at this term. *Post,* 478.

*The Solicitor General,* with whom *The Attorney General* and *Mr. A. F. Myers* were on the brief, for the United States.[1]

*Mr. Jackson E. Reynolds,* with whom *Mr. Charles Heebner* and *Mr. John G. Johnson* were on the brief, for Reading Company, Philadelphia & Reading Railway Company, and the Philadelphia & Reading Coal & Iron Company.[2]

*Mr. Robert W. De Forest,* with whom *Mr. Charles E. Miller* was on the brief, for Central Railroad Company of New Jersey.

*Mr. Henry S. Drinker, Jr.,* and *Mr. Abraham M. Beitler* filed a brief on behalf of the Lehigh Coal & Navigation Company.

---

[1] At the first and second hearings the case was argued by *Mr. Solicitor General Davis* and *Mr. Assistant to the Attorney General Todd. Mr. Attorney General Gregory* and *Mr. Thurlow M. Gordon,* Special Assistant to the Attorney General, also were on the brief.

[2] At the first hearing *Mr. John G. Johnson* argued the case for the Philadelphia & Reading Coal & Iron Company.

*Mr. John J. Beattie* filed a brief on behalf of the Lehigh & Hudson River Railway Company.

*Mr. Wm. Jay Turner* filed a brief on behalf of the Lehigh & New England Railroad Company.

· The following is a summary of the oral argument for the Reading Company et al.

The appellees are not accused of fixing prices by contract with competitors, bringing about any deterioration in product, acquiring additional coal deposits since 1890, dismantling or abandoning properties, limiting output, exclusive or price controlling sales contracts, monopolization of local dealers, espionage over the business of competitors, partitioning the country into non-competitive districts, discriminating in prices to destroy competitors, adopting unfair business policies, exacting unreasonable prices, deriving excessive profits from the coal business, unfair treatment of employees, or unfair treatment of competitors. Their prices for transportation and for coal have been reasonable, not excessive, "monopoly" prices.

There are in the case three charges: alleged violation of the commodities clause; alleged monopoly in the Schuylkill region; alleged combination in restraint of trade resulting in the Reading's purchase of control of the Jersey Central.

The tests to be applied to determine whether the Reading Railway Company is violating the commodities clause in transporting coal owned by the Philadelphia & Reading Coal & Iron Company at the time of transportation are those laid down in *United States v. Lehigh Valley R. R. Co.*, 220 U. S. 257, and *United States v. Delaware, Lackawanna & Western R. R. Co.*, 238 U. S. 516. These tests are also buttressed by the court's declaration of the general object

of the statute to have been to put an end to the carrier's "opportunity to discriminate in favor of itself against other shippers in the rate charged, the facility furnished or the quality of the service rendered." *Delaware, Lackawanna & Western R. R. Co.* v. *United States,* 231 U. S. 363.

The court is not concerned with the question of who ultimately receives the profit from the sale of the commodity, because it has repeatedly held that the carrier might legally own all of the stock of the corporation which owned the commodity at the time of transportation and thereby receive all the profits from the sale of the same. *United States* v. *Delaware & Hudson Co.,* 213 U. S. 366, 413, 414.

Furthermore, this court, recognizing the fact that in the legislative progress of the commodities clause in the Senate, where it originated, an amendment in specific terms providing that the enactment should embrace common ownership of stock in railroad companies and coal companies by the same stockholders, was rejected (40 Cong. Rec., pt. 7, pp. 7011–7014), has also unequivocally held that such common ownership "cannot be used as a test by which to determine the legality of the transportation of such [a coal] company's coal by the interstate carrier." *United States* v. *Delaware, Lackawanna & Western R. R. Co.,* 238 U. S. 516, 526.

The Reading Companies were in existence long prior to the time the commodities clause went into effect—two of them for 37 years and the third for 12 years. The Reading Railway has never had any title to coal lands, has never undertaken any mining operations and has never been engaged in merchandising coal; and the Reading Railway and the Reading Coal Company have never been parties to any sales agency contract of the kind condemned in the *Lackawanna Case.* These factors, which are the converse of those presented in

the *Lackawanna Case*, differentiate the two cases completely.

The present state of the law places upon the Government the burden of showing, by a preponderance of the proof, that the affairs of the Railway Company and the Coal Company have been so commingled and the distinctions between them so obliterated, as to disregard the fact that they were separate juridical beings; cause them to be one and inseparable, making their affairs indistinguishable; destroy the entity of the Coal Company; and make it a mere puppet subject to the control of the Railway Company and a mere department thereof.

The origin of the holding of the capital stocks of the Coal Company and the Railway Company by the Reading Company cannot be treated as a "mere subterfuge and sham to defeat the commodities clause." The lower court was correct in finding that the reorganization was carried out with scrupulous regard for the law, in entire good faith, and without subterfuge or sham. It was right in its conclusion that the validity of the charter powers of the Reading Companies cannot be impeached; that their right to exist cannot be denied; that complete legislative authority to do the acts they have done cannot be gainsaid, and never has been questioned by the Commonwealth of Pennsylvania, and that the charters of the three companies gave the undoubted right to issue the securities and make the conveyances described.

The ownership of railroad equipment by the Reading Company and the lease thereof to the Railway Company have not been shown to have resulted in giving the latter as a corporation, for its own corporate purposes, "complete power over the affairs of the Coal Company, as if the Coal Company were a mere department of the railroad."

The purchase money mortgage of the Railway Company scrupulously observes the fact that the Railway Company

and the Reading Company are separate juridical beings and in no manner commingles the affairs of the Railway and Coal Companies so as to cause both such corporations to be one for all purposes.

The general mortgage of the Reading Company does not obliterate the distinctions between the Railway Company and the Coal Company and cause them to be one and inseparable.

The Government's evidence and arguments on the extent to which the Coal Company and the Railway Company have officers and offices in common are largely iteration in the past tense of conditions existing more than a decade ago, not only prior to this court's illuminating decision in 1911 in *United States* v. *Lehigh Valley R. R. Co.*, 220 U. S. 257, but even before the commodities clause itself went into effect on May 1, 1908. That evidence is clearly immaterial and irrelevant as to conditions now existing. Equitable decrees normally speak in the present tense and are applied to remedy existing evils and not to characterize or condemn past wrongs. Even in an action under the Sherman Act an opportunity might well be afforded for a *locus pœnitentiœ*. *United States* v. *Lehigh Valley R. R. Co.*, 225 Fed. Rep. 399, 403, 404.

The foregoing facts fully justified the court below in finding that there was a *bona fide* separate administration of the affairs of the Coal Company. *United States* v. *Lehigh Valley R. R. Co.*, 220 U. S. 257, 274.

Attention is directed to the fact that the two companies employ the same counsel and treasurer, and also have the majority of directors in common. Probably no two employees of modern industrial organizations could do less toward the commingling of the administrative and other affairs of two corporations than the counsel and the treasurer. These incidents are of minor importance and do not affect the question of whether the businesses of the companies are rendered indistinguishable. That was an

issue of fact and the record conclusively establishes that
no such result has followed from the joint employment of
these two individuals.   It is repeatedly shown that the
funds and accounts of the two companies are scrupulously
kept distinct, and there is no evidence whatever of a com-
mingling of the affairs of the two corporations by their
counsel.

The proof of the complete autonomy of the Coal Com-
pany and the Railway Company was uncontroverted, and
conclusive.   An excellent summary of the salient features
of the testimony appears in Judge McPherson's opinion
below.

In view of the entire autonomy of the three Reading
Companies, there is no ground for the contention that the
Railway Company is transporting in interstate commerce
anthracite coal mined or produced by it, or under its
authority, or which it owns in whole or in part, or in which
it has any interest, direct, or indirect.

As to the alleged monopoly in the Schuylkill Region:

The Government does not raise the issue as to whether
the Coal Company in and of itself is a combination in
restraint of interstate commerce or a monopolization
thereof.   That company was created May 18, 1871, and
by its charter it was lawful for any railroad company
existing under the laws of the State to subscribe for or
purchase its stock, or to purchase or guarantee its bonds.
The corporation then owning the Reading Railroad prop-
erties immediately purchased all the stock of the Coal
Company.   The latter then immediately set about the
purchase and lease of coal lands, acquiring 80,000 acres
before the end of 1872.   By the year 1881 the Coal Com-
pany controlled 98,500 acres of coal land (or slightly in
excess of the acreage alleged in the petition).   Shortly
afterwards, in 1885, the stockholders deliberately adopted
a policy opposed to all further acquisition.   Thus on the
government theory the close relations alleged to exist

between the mining and transportation properties and their owners have existed for almost half a century (or 20 years before the passage of the Anti-Trust Act); and the Coal Company's title to its present holdings of coal lands was vested in it almost 40 years ago, or 9 years antecedent to the passage of that act. The mining and marketing of coal on the one hand and its transportation on the other are not competitive businesses. The court below, with these factors before it, dismissed the petition in respect of this branch of the case, and this court, on its precedents, we believe, will affirm this action because it holds "the disintegration aimed at by the statute does not extend to reducing all manufacture to isolated units of the lowest degree. The combination was not unlawful so far as it did no more than put the different groups of non-competing [enterprises] into one control." *United States* v. *Winslow,* 227 U. S. 202, 217, 218.

The Government does not contend that the Coal Company is an unlawful combination or a monopoly, and it cannot be contended that the transportation is competitive with the mining and marketing; the transportation is intermediate between the two and supplements them.

This court, like the court below, will be repelled by the consequences of holding with the Government's contentions. *United States* v. *United Shoe Machinery Co.,* 247 U. S. 32, 45, 46.

There was no secrecy indicating a guilty plan or conspiracy. It was all done pursuant to notices to investors all over the world, in the open, and to meet the financial exigencies of the situation. The plan was adopted by Edward M. Paxson, the receiver, who had just resigned as Chief Justice of the Supreme Court of Pennsylvania and the writer of that court's decision in *Commonwealth* v. *New York, Lake Erie & Western R. R. Co.,* 132 Pa. St. 591. The resulting reorganization was declared valid by the Attorney General of the Commonwealth, January 2, 1897.

The legality of the plan was approved by eleven eminent
counsel. . The Commonwealth of Pennsylvania, by its
statutory policy from 1818, had declared to be normal, and
affirmatively encouraged, the close inter-relation of min-
ing, transporting and selling anthracite coal. (Const.
1874, Art. XVII, § 5, adopted in convention, of which
Judge Dallas was a member.) It was approved by Judge.
Dallas and Judge Acheson, of the Circuit Court for the
Eastern District of Pennsylvania, contemporaneously
with the reorganization. It was regarded as entirely legal
by Judges Gray, Lanning and Buffington ten years later.
*United States* v. *Reading Co.*, 183 Fed. Rep. 427, 457,
459, 490. It was declared to be lawful by Judges McPher-
son, Hunt and Buffington twenty years later. *United
States* v. *Reading Co.*, 226 Fed. Rep. 229, 266–276.

The facts do not indicate monopoly or combination in
restraint of trade. The Coal Company is not charged
with such guilt. It produces less than 15 per cent. of
tonnage. In the Schuylkill region it has 35 operations
and one-half the tonnage. Other producers have 53.
On the Reading Railway it does not monopolize produc-
tion or sales. · Of production it has only 65 per cent. In
sales it must compete with 116 other shippers on 8 other
railroads and 60,000,000 tons of competitive tonnage
because the Pennsylvania Railroad reaches every com-
munity reached by the Reading Railway and makes joint
rates with every other anthracite railroad. At tidewater
and all distant points it meets the competition of the
entire production. The court below unanimously sup-
ports the foregoing conclusion. 226 Fed. Rep. 270–271.

The Reading Railway cannot be treated as a monopoly.
Its transportation status in the Schuylkill region has been
practically the same for 50 years. The Government
alleges no acquisition of other carriers there since 1870.
Its share of total anthracite transportation is less than
19 per cent; the Lehigh Valley Railroad's is greater. It

does not monopolize the Schuylkill region. It serves 63 collieries, 11,500,000 tons; other railroads serve 34 collieries, 7,000,000 tons. It does not monopolize the collieries it serves. Built in 1833, it has the natural advantages of a pioneer—occupation of passes, and possession of best grades. It serves the region admirably. It encounters the competition of the total tonnage in all markets as does the Coal Company.

The Reading Company is not a monopoly or combination in restraint of trade. It merely coördinates and integrates the non-competitive and complementary businesses of mining, transporting and merchandising anthracite coal, thereby promoting and stimulating interstate trade and commerce. No vice exists in including transportation, because its chief competitors enjoy a like advantage, and government regulations preclude abuse in employing transportation facilities.

There is no basis for the decree requested by the Government, tearing down an investment of $300,000,000, made originally 50 years ago, when the titles vested, and upon the stability of which investors have justifiably relied for a generation,—authorized by state statutes, approved by state officers and courts, reorganized under supervision of federal courts 23 years ago, and approved unanimously by circuit judges in 1915.

The purchase of the Jersey Central stock was a normal industrial development—a defensive measure with no intent to unduly suppress competition.

The railroads combined were not competing in the sense of Mr. Justice Day's definition in the *Union Pacific Case.* One was never striving for traffic which the other was seeking to gain. 226 U. S. 87. They did not render service to the same shipper, *id.* 87, nor cater to demands of identical patrons. *Id.* 88. They were not engaged in the same carrying trade from the same point of origin to the same destination. *Id.* 99. They were, on the con-

trary, complementary and supplementary, one to the other, in the sense described in this court's opinion respecting the form of decree permitting the combination of the Union Pacific and Central Pacific. If, as a fact, they are thus supplementary the Government concedes the propriety of their combination.

Even if the Government's theory, that the two roads are competitive because both transport anthracite, be indulged; nevertheless their unification was valid because "the extent of the control thereby secured over instrumentalities which commerce is under compulsion to use," under the tests laid down in *United States* v. *St. Louis Terminal,* 224 U. S. 383, 394, 395, "left the competitive conditions in the coal carrying business very slightly affected by the elimination of competition between the Central and the Philadelphia and Reading." 183 Fed. Rep. 488, 490.

The Government's theory of competition is unsound. It makes all carriers competitive, and is contrary to the settlement in the *Union Pacific Case.* Its theory of competition is impossible of application. No court can discover the necessary directness of relationship of cause and effect to enable it to say that the abatement of competition of such an intangible character necessarily results in a case of unlawful restraint. This impossibility arises from the factors of uncertainty, speculation and remoteness, illustrated by the extent of competition of anthracite coal with other fuels; by the situation in the New England market, where 70,000,000 tons are in potential competition, and there are numerous uncontrolled rail and water routes, the Reading handling only 3½ per cent. of the potential supply; and by similar conditions at New York and elsewhere—even on the Reading Railway itself.

But even according to the government theory, competition was unaffected. The Central did not reach the Reading territory, and competition was continued by eight

other lines in close proximity to the Central and Reading. See 183 Fed. Rep. 457, 488, 490. The vital question is not the amount of competition suppressed, but the amount remaining. If, as here, the competitors remaining are numerous, large, and powerful the restriction of competition cannot be deemed undue. The issue is one of fact and not of law and must be decided on the evidence, not on theory or speculation. The evidence covering the period since 1901 when this combination was formed shows the facts to be that the Reading's powerful competitors have increased their anthracite traffic by much greater percentages than has the Reading; that any diminution of the Reading's service to the public or attempted restraint on interstate trade would be frustrated immediately by the preponderant competitive power of its eight powerful rivals; that the public has been benefited for any loss of competition resulting from the combination by the more than compensating advantage derived from the upbuilding of the half dozen through routes for freight and passenger traffic competing with the Pennsylvania Railroad. This court would not be justified in destroying these routes and their advantage to the public merely to guard against a speculative possibility of injury which the evidence shows cannot ensue. In view of its decision in the *St. Louis Terminal Case,* this court should hold the lower court's view of the evidence,— considering the lessons of the war as to what restrains trade, the joint operation of railroads, and the provisions of impending railroad legislation.

As for the Coal Companies, the Reading Company's influence over the Wilkes-Barre Company was only incidental and negligible. There is no evidence of a motive to control production. Competition was practically unaffected, and the management of the two companies was not amalgamated.

The Reading Company did not create a monopoly or

combination in restraint of the anthracite trade in 1901. The trade as a whole has expanded; the number of employees, their employment and earnings have increased; and production has kept pace with population.

The Reading did not acquire in 1901 sufficient power to monopolize or restrain the trade had it sought to do so. The combined business of the two coal companies was then only one-fourth of the total business, and in the interim has shrunk until now it is only one-fifth. It does not now possess the power to monopolize or restrain the trade even if it wished to do so.

If the Government's most extravagant contention had been sustained by proof, their criticism of the coal land holdings makes no case presently calling for the interposition of the action of this court. It will be time enough to destroy such a monopoly when it appears and when it has gained power to injure the public. Now the court should deal only with the present actualities. By the time that such a monopoly arises, if it ever does, it may be that the public policy will foster it, or we may have a nationalization of all mines.

Finally, the Government's contentions now are inconsistent with its attitude in the *Harvester Case*. On November 2, 1918, the Department of Justice consented to a decree in that case in and by which, in order to "restore competitive conditions and bring about a situation in harmony with law," the company was only required to sell such of its lines of harvesting machines as would leave it at least 66 per cent. of the industry.

Mr. JUSTICE CLARKE delivered the opinion of the court.

These are appeals from a decree entered in a suit instituted by the Government to dissolve the intercorporate relations existing between the corporation defendants, for the alleged reason that through such relations they

constitute a combination in restraint of interstate commerce in anthracite coal, and an attempt to monopolize or a monopolization of such trade and commerce in violation of the first and second sections of the Anti-Trust Act of Congress, of July 2, 1890, c. 647, 26 Stat. 209; and also for the alleged reason that the defendants, Philadelphia & Reading Railway Company and Central Railroad Company of New Jersey are violating the commodities clause of the Act of Congress of June 29, 1906, c. 3591, 34 Stat. 585, by transporting over their lines of railroad, in interstate commerce, coal mined or purchased by coal companies with which they are associated by stock ownership.

It will contribute to brevity and clearness to designate the defendant corporations as follows: Reading Company, as the Holding Company; Philadelphia & Reading Railway Company, as Reading Railway Company; Philadelphia & Reading Coal & Iron Company, as Reading Coal Company; Central Railroad Company of New Jersey, as Central Railroad Company; Lehigh & Wilkes-Barre Coal Company, as Wilkes-Barre Company; Lehigh Coal & Navigation Company, as Navigation Company.

Practically all of the anthracite coal in this country is found in northeastern Pennsylvania, in three limited and substantially parallel deposits, located in valleys which are separated by mountainous country. For trade purposes these coal areas are designated: the most northerly, as the Wyoming field, estimated to contain about 176 square miles of coal; the next southerly, as the Middle or Lehigh field, estimated to contain about 45 square miles, and the most southerly, as the Schuylkill field, estimated to contain about 263 square miles of coal.

The annual production of the mines in these three fields in 1896 was about 43,640,000 tons and in 1913 it slightly exceeded 71,000,000 tons. The chief marketing centers for this great tonnage of coal are New York, distant by rail from the fields about 140 miles, and Philadelphia, distant

about 90 miles. From these cities it is widely distributed
by rail and water throughout New York and New Eng-
land, and to some extent, through the South.

Such a large tonnage was naturally attractive to rail-
road carriers, with the result that the Wyoming field has
six outlets by rail to New York Harbor, viz: The Central
Railroad of New Jersey and five others, known as initial
anthracite carriers. The Lehigh field has three such rail
outlets, but the largest, the Schuylkill field, has only two
direct rail connections with Philadelphia and New York,
viz: The Reading and the Pennsylvania Railroads. Out-
lets by canal to Philadelphia and tidewater, at one time
important, may here be neglected.

This description of the subject-matter and of its relation
to the interstate transportation system of the country will
suffice for the purposes of this opinion. It may be found
in much greater detail in the cases cited in the margin.[1]

The essential claims of the Government in the case have
become narrowed to these, viz:

First: That the ownership by the Holding Company of
controlling interests in the shares of the capital stocks of
the Reading *Railway* Company, of the Reading Coal
Company and of the Central Railroad Company, con-
stitutes a combination in restraint of interstate trade and
commerce and an attempt to monopolize and a monopo-
lization of a part of the same in violation of the Anti-
Trust Act of July 2, 1890.

Second: That the Holding Company in itself constitutes
a like violation of the act.

Third: That certain covenants and agreements between
the Central Railroad Company and the Navigation Com-

---

[1] *United States* v. *Reading Co.*, 183 Fed. Rep. 427; *United States* v.
*Reading Co.*, 226 Fed. Rep. 229; *United States* v. *Delaware & Hudson
Co.*, 213 U. S. 366; *United States* v. *Lehigh Valley R. R. Co.*, 220 U. S.
257; *United States* v. *Delaware, Lackawanna & Western R. R. Co.*, 238
U. S. 516; *United States* v. *Reading Co.*, 226 U. S. 324.

pany contained in a lease, by the latter to the former, of the Lehigh & Susquehanna Railroad, constitute a like violation of the act.

Fourth: That the transportation in interstate commerce by the Reading Railway Company and by the Central Railroad Company, of coal mined or purchased by the coal companies affiliated with each of them constitutes a violation of the commodities clause of the Act to Regulate Commerce.

Pursuant to the provisions of the Act of June 25, 1910, c. 428, 36 Stat. 854, the case was heard by three Circuit Judges of the Third Circuit, who while holding against the contention of the Government on many of the prayers for relief in the bill, some generally and some without prejudice, also held that the Reading Coal Company and the Wilkes-Barre Coal Company were naturally competitive producers and sellers of anthracite coal and that their union through the Holding Company and the Central Company constituted a combination in restraint of trade within the Anti-Trust Act, and for this reason the Central Company was ordered to dispose of all the stock, bonds and other securities of the Wilkes-Barre Coal Company owned by it and was enjoined from requiring the Coal Company to ship its coal over the lines of the Central Company.

The court also held that clauses in mining leases by the Reading Coal Company and by the Wilkes-Barre Coal Company, and their subsidiaries, requiring the lessees to ship all coal produced, over roads, named or to be designated, were unlawful and void.

The case has been appealed by both parties and is before us for review on all of the issues as we have thus stated them.

Reference to the history of the properties now controlled by the Holding Company will be of value for the assistance it will be in determining the intent and purpose

with which the combinations here assailed were formed. *Standard Oil Co. v. United States,* 221 U. S. 1, 46, 76.

The Philadelphia & Reading *Railroad* Company was chartered by special act of the Pennsylvania General Assembly in 1833, and it conducted the business of a railroad carrier prosperously for about thirty years, when, as its annual reports show, it embarked upon the policy of attempting to control the anthracite tonnage of the Schuylkill field by acquiring extensive ownership of coal lands. Thus, the report of the Company for 1871 contains the following:

"Up to this time about 70,000 acres of the best anthracite coal lands in Pennsylvania have been acquired and will be held by an auxiliary company, known as the Philadelphia and Reading Coal and Iron Company, of, which the Philadelphia and Reading Railroad Company *is the only stockholder.* The result of this action has been to secure—and *attach to the company's railroad*—a body of coal land capable of *supplying all the coal-tonnage that can possibly be transported over the road for centuries.*"

And this is from the report for 1880:

"The transportation of coal has always been a source of great profit to the railroad company, and the only doubt in the past about the permanency of the earning power of the company as a transporter was due to the *fear that rival companies would tap the Schuylkill region,* and divert the coal tonnage to their own lines. *This danger was happily averted by the purchase of the coal lands.*"

And this from the report of 1881:

"The coal estates of the Philadelphia and Reading Company . . . consist of 91,149 acres (142 square miles) of coal lands, *which is sixty per cent of all the anthracite lands in the Schuylkill district, and thirty per cent of all in Pennsylvania.*"

This area of coal lands had increased by 1891 to 102,573 acres, of which the report said:

"The coal lands comprise in extent about 33 per cent of the entire anthracite coal fields of the State, and taking into account the aggregate thickness of the veins on the company's lands, and the greater proportionate depletion of the estates in the other regions which has been going on for many years, it must be conceded that we have *at least 50 per cent of the entire deposit remaining unmined.*"

As if in further pursuit of this now settled purpose, in the following year, 1892, the Reading Railroad Company leased the Lehigh Valley Railroad and the Central Railroad of New Jersey for 999 years. These were both anthracite carriers, competing with the Reading and each had an important coal mining subsidiary company. But the lease by the Central Railroad Company was assailed in the New Jersey courts and all operations under it were enjoined, with the result that both leases were abandoned.

It is obvious that these reports show an avowed and consistently pursued purpose (not then prohibited by statute) to secure by purchase a dominating control over the coal of the Schuylkill field and over the transportation of it to market.

In the large financial operations incident to the expansion policy thus described, bonds were issued, secured by a mortgage on all of the property of the Reading Railroad Company and of the Reading Coal Company. In 1893 there was default in the payment of interest on these bonds and receivers were appointed who operated both properties until 1896 when they were sold to representatives of the creditors and stockholders of the two companies, and under a scheme of reorganization, the validity of which is assailed in this suit, both properties were transferred to three corporations in the manner now to be described:

1st. To the Reading *Railway* Company, a corporation newly organized under the laws of Pennsylvania, were allotted about 1,000 miles of the railroad (but none of

the equipment) which had been owned or leased by the former Reading *Railroad* Company. The capital stock of this company was fixed at $20,000,000 and it issued $20,000,000 of bonds, all of which were given to the Holding Company. The property thus transferred was valued, in the representations made at the time to the New York Stock Exchange, at $90,000,000. In 1896 this railroad carried in excess of 9,000,000 tons of anthracite,—more than one-fifth of the then total production of the country. But by the plan of reorganization adopted it was disabled from performing its functions as a carrier, except with the aid of the Holding Company, for all of the equipment, engines, cars and ships, owned by the former Railroad Company, and its tidewater terminals at Philadelphia and on New York Harbor, were allotted to the Holding Company.

2nd. By the decree of sale the Reading Coal and Iron Company was released from its former obligations and to it thus freed the principal part of the property (coal and other), owned by it before the sale, was allotted and re-transferred upon condition, that it would deliver all of its capital stock to the Holding Company, would become co-obligor with that company on bonds to be issued, and would join with it in executing a mortgage for $135,000,000 on all of its property to secure such bonds. This company thus came into possession of 102,573 acres of anthracite lands, owned and leased,—almost two-thirds of the entire acreage of the Schuylkill coal field,—stocks and bonds in other coal companies, coal in storage and other property, all of the estimated value of $95,000,000.

3rd. To serve the purposes of the intended Holding Company, a charter granted in 1871 by special act of the General Assembly of Pennsylvania, but unused for twenty years, was utilized. This charter was of the class denominated "omnibus" by the Supreme Court of Penn-

sylvania, and in terms it authorized the company to engage in, or control, almost any business other than that of a bank of issue,—this broad charter was the occasion for making use of the company in this enterprise. The corporate name was changed to "Reading Company," its capital stock was increased from $100,000 to $140,-000,000, and the purchasers at the receivers' sale allotted and transferred to it railroad equipment, real estate, colliers and barges, formerly owned by the Reading *Railroad* Company, together with stocks which gave it control of more than thirty short line railroads, aggregating 275 miles of track, and other property of large value, in addition to all of the bonds and stock of the new Reading *Railway* Company and all of the stock of the Reading Coal Company.

The result of this intercorporate transfer of the property, owned before the reorganization by the Reading *Railroad* Company and the Reading Coal and Iron Company, was that the Holding Company without any outlay—solely because the creditors and stockholders of the former Reading Railroad Company and of the Reading Coal Company desired to establish the proposed scheme for control of the properties formerly owned by the two companies—became the owner of the title to railway equipment, real estate, colliers and barges of an estimated value of $34,400,000; plus all of the capital stock and bonds of the new Railway Company, $40,-000,000; plus all of the capital stock of the Coal Company, $8,000,000, and a contract by that company to mortgage, for the use of the Holding Company, its entire property; plus other stocks, bonds and mortgages owned by the former Railroad Company of the estimated value of over $38,000,000,—making a total value, as represented at the time to the New York Stock Exchange, of $193,613,000.

Thus, this scheme of reorganization, adopted and exe-

cuted six years after the enactment of the Anti-Trust Act, combined and delivered into the complete control of the board of directors of the Holding Company all of the property of much the largest single coal company operating in the Schuylkill anthracite field, and almost one thousand miles of railway over which its coal must find its access to interstate markets. This board of directors, obviously, thus acquired power: to increase or decrease the output of coal from very extensive mines, the supply of it in the market, and the cost of it to the consumer; to increase or lower the charge for transporting such coal to market; and to regulate car supply and other shipping conveniences, and thereby to help or hinder the operations of independent miners and shippers of coal. This constituted a combination to unduly restrain interstate commerce within the meaning of the act. *United States* v. *Union Pacific R. R. Co.*, 226 U. S. 61.

Obviously, also, it made the Coal Company and the Railway Company mere agents or instrumentalities of the Holding Company—the mining and transportation departments of its business—for producing, purchasing, and selling coal and for transporting it to market. The Reading *Railway* Company and the Reading Coal Company each had thereafter but one stockholder,—the Holding Company—and their earnings were to be distributed not in proportion to the shares of their capital stocks, aggregating $28,000,000, but were to go to the creditors and shareholders of the Holding Company, with its mortgage debt of $135,000,000 and its capital stock of $140,000,000. The Holding Company thus served to pool the property, the activities and the profits of the three companies. *Northern Securities Co.* v. *United States*, 193 U. S. 197, 327, 362.

It will be profitable to consider next what use was made of the great power thus gathered into the one Holding Company.

In 1898 this Holding Company entered into a combination with five other anthracite carrying railroad companies to prevent the then contemplated construction of an additional line of railway from the Wyoming field to tidewater, which independent miners and shippers of coal were promoting for the purpose of securing better rates on their coal to the seaboard. In a mere holding company, the Temple Iron Company, all six carriers combined, as stockholders for the purpose of providing $5,000,000 with which the properties of the chief independent operators, Simpson and Watkins, were purchased and thereby the new railroad project was defeated. The president of the Holding Company was active in the enterprise and that company, although only one of six, became responsible for thirty per cent. of the required financing. In *United States* v. *Reading Co.*, 226 U. S. 324, 351, this court characterized what was done by this combination, under the leadership of the Holding Company, in these terms:

"The New York, Wyoming & Western Railroad Company was successfully strangled, and the monopoly of transportation collectively held by the six defendant carrier companies was maintained."

And, again, at p. 355:

"We are in entire accord with the view of the court below in holding that the transaction involved a concerted scheme and combination for the purpose of restraining commerce among the States in plain violation of the Act of Congress of July 2, 1890."

About the year 1900 the Holding Company and many other initial anthracite carriers and their controlled coal companies, pursuant to an agreement with each other, made separate agreements with nearly all of the independent producers of coal along their lines, to purchase at the mines "all the anthracite coal thereafter mined from any of their mines now opened or operated or which might thereafter be opened and operated," and to pay therefor

65% of the average price of coal prevailing at tidewater points at or near New York, computed from month to month. In the case above cited, this court discussed these contracts and declared: that they were made for the purpose of eliminating the competition of independent operators from the markets and thus removing "a menace to the monopoly of transportation to tidewater which the defendants collectively possessed"; that before these contracts, there existed not only the power to compete but actual competition between the coal of the independents and that produced by the buying defendants, but that after the contracts were made "such competition was impracticable"; that the case fell well within not only the *Standard Oil* and *Tobacco Cases,* 221 U. S. 1, 106, but was of such an unreasonable character as to be "within the authority of a long line of cases decided by this court;" and finally that the defendants had combined, by and through the instrumentality of the 65% contracts with the purpose and design of unlawfully controlling the sale of the independent output of coal at tidewater.

Thus, this court held that once within two years and again within four years after it was organized, this Holding Company used the great power which we have seen was centered in its board of directors, by adroit division of property and of corporate agency, for the purpose of violating, in a flagrant manner, the Anti-Trust Act of 1890.

Almost immediately after the two attempts to monopolize the trade in anthracite thus condemned by this court, the Holding Company, in January, 1901, purchased a controlling interest in the capital stock of the Central Railroad Company. When this suit was commenced that company was operating 675 miles of track, over which it carried in 1913, 10,783,000 tons of anthracite,—almost one-half of its total freight traffic. Its capital stock was then $27,436,000 and its funded debt was $46,881,000.

This Central Company owned, at the time, in excess of

eleven-twelfths of the capital stock of the Wilkes-Barre Coal Company, with a capital stock of over $9,000,000 and a funded debt of about $17,000,000. And that company owned or had leased in excess of 14,000 acres of coal bearing lands—13,000 acres in the Wyoming field—and in the year ending June 30, 1913, it shipped from its lands thus owned or controlled, 6,243,000 tons of coal, which was sold for over $20,000,000.

Immediately after this purchase, the president of the Holding Company, Mr. Baer, was made president of the Central Railroad Company and of the Wilkes-Barre Coal Company, and remained such until his death, after the commencement of this suit, and from one-third to one-half of the directors of each company were thereafter chosen from the board of the Holding Company. Thus from the time of this purchase both companies have been actively dominated by the Holding Company management.

It is argued that the Central Railroad, thus acquired, and the Reading system were not competitors, but this question is put beyond discussion by the testimony of Mr. Baer, the president of the Reading Company, and his immediate predecessor in office, Mr. Harris. The former testified:

"Q. You are president of the defendants, the Reading Company, Philadelphia and Reading Railway Company, Philadelphia and Reading Coal and Iron Company, the Central Railroad Company of New Jersey, the Lehigh and Wilkes-Barre Coal Company and the Temple Iron Company?

"A. I am. . . ."

"Q. What do you regard as the competitors of the Philadelphia and Reading now in New York Harbor, as to anthracite coal? . . .

"A. All the companies that ship to New York. They would be the Pennsylvania Railroad, the Lehigh Valley, the Delaware and Lackawanna, the Delaware and Hudson,

the Erie, Ontario and Western. I guess those are all the roads leading to New York directly or indirectly. [He did not name the Central Company because it was a part of the Reading system when he testified.]"

"Q. Those roads are all carrying anthracite coal to the New York harbor?

"A. Yes, sir."

"Q. And you regard them as competitors who must be considered in fixing rates?

"A. Yes, sir; unquestionably."

Mr. Harris testified:

"Q. During the time that you were president of the Philadelphia & Reading Railroad Company, from 1893 to 1901, what were the competitive roads in the coal trade with which you came in competition?

"A. We came in competion with all the roads that were carrying coal from Pennsylvania."

"Q. Name the principal ones in reference to carrying coal from the coal mines to New York harbor.

"A. The Reading, the Lehigh Valley, *the Central Railroad of New Jersey*, the Delaware, Lackawanna and Western, the Erie, and the Pennsylvania Railroad."

That the Reading Coal Company and the Wilkes-Barre Coal Company were competitors before the latter passed under the control of the Holding Company is obvious, but Mr. Baer put this also beyond dispute by testifying:

"Q. Prior to 1901 were the Philadelphia and Reading Coal and Iron Company and the Lehigh and Wilkes-Barre Company competitors as sellers of coal in New York harbor?

"A. Yes; and they are today."

"Q. And generally throughout the eastern territory they were competitors at that time?

"A. Yes, sir; through that northern territory. Not in this territory, nor in the southern."

Thus, by this purchase, the Reading Holding Company

acquired complete control, not only of one of the largest competitive anthracite carriers, but also of one of the largest competitive coal producing and selling companies, in the country. The anthracite tonnage of the Central and Reading Railway Companies thus combined, exceeded, at the time, 18,000,000 tons,—over one-third of the then total production of the country,—and the revenue derived from it was more than one-third of the total earnings of the two railroad companies.

In 1915 the Interstate Commerce Commission concluded an investigation of the "Rates, practices, rules and regulations governing the transportation of anthracite coal," which had been in progress for three years. The eleven initial anthracite carriers which have lines penetrating the coal producing region were required to furnish special reports as to their anthracite coal transportation operations, and they appeared and participated in the hearing. The result of this exhaustive investigation was that the Commission found: that since about 1901, with variations and exceptions which are negligible here, the carriers have had the same fixed and flat rates to tidewater, regardless of the distance and character of the haul; that these rates were the result of coöperation or combination among the carriers; and that they were excessive to such an extent that material reductions by all of the carriers were ordered, including, of course, those of the Central and Reading companies. The Commission also found, and this appears in the record of this case, that the Reading Coal Company had never paid any dividends on its stock, and that, while the books of the Holding Company showed the Coal Company to have been indebted to it in a sum exceeding $68,000,000 for advances of capital made by the Reading *Railroad* Company before the reorganization in 1896, it has paid interest thereon only occasionally and in such small amounts that up to 1913 it fell short by more than $30,000,000 of equaling 4% per

annum on the indebtedness. In the meantime advances
of large sums had been made by the Holding Company
to the Coal Company and unusual credits had been allowed
the latter in the payment of its freight bills. This dealing
of the Holding Company with the Reading Coal Com-
pany, and similar dealing of the Central Company with the
Wilkes-Barre Coal Company and the Navigation Com-
pany are denounced by the Commission as unlawful dis-
crimination against other shippers of coal over the rails
of these two companies, and, obviously, such favoritism
tends to discourage competition and to unduly restrain
interstate commerce.

Upon this history of the transactions involved, not
controverted save as to some findings of the Interstate
Commerce Commission, we must proceed to judgment,
and very certainly it makes a case calling for the appli-
cation of repeated decisions of this court, which clearly
rule it.

It will be convenient to first dispose of several minor
contentions.

In 1871 the Navigation Company leased the Lehigh &
Susquehanna Railroad, which it owned, to the Central
Railroad Company, by an instrument containing a cove-
nant which the Government claims requires the Navi-
gation Company to ship to market over the leased line
three-fourths of all of the coal which it should produce
in the future. This covenant has been amended and
supplemented by several agreements but not so as to
essentially modify it with respect to the contention we
are to consider.

It is argued that this covenant necessarily imposed
an undue restriction upon the Navigation Company in
selecting its markets and in shipping its coal, in violation
of the Anti-Trust Act.

It is not entirely clear that the covenant will bear the
restrictive interpretation as to shipments which the

Government puts upon it, but, assuming that it may be so interpreted, nevertheless, the conditions and circumstances of the case considered, the result contended for cannot be allowed.

When the lease was made, in 1871, the Central Railroad extended from Jersey City to its western terminus at Phillipsburg, New Jersey, and it was without access to the coal fields. The Lehigh and Susquehanna Railroad was about 100 miles in length and extended from Phillipsburg into the Wyoming field, where the Navigation Company owned extensive coal producing properties and mines. The lines of the two companies were in no sense competitive, but, on the contrary, the Lehigh and Susquehanna line served as a natural extension of the Central Company's lines to the great tonnage producing coal districts. The rental to be paid was one-third of the gross earnings of the railroad and it was natural and "normal" that the lessor should desire that the traffic should continue to be as large as possible. Plainly this covenant was not written with the purpose of suppressing interstate commerce and the history of its operation shows that, instead of suppressing it, it has greatly promoted it. The claim is quite too insubstantial to be entertained and the decree of the District Court with respect to it will be affirmed and the bill, as to it, dismissed.

In many leases for the operation of coal producing lands the Reading Coal Company and the Wilkes-Barre Coal Company incorporated a covenant that the lessee should ship all coal mined by rail routes, which were named or which were to be designated. Since this covenant was resorted to as a part of the scheme to control the mining and transportation of coal, which is condemned as unlawful in this opinion, the decree of the District Court enjoining the lessors and the other defendants herein from attempting to enforce such covenants will be affirmed.

The other charges against the Lehigh Coal and Navi-

gation Company and the case stated in the bill with re-
spect to the Wilmington & Northern Railroad Company,
the Lehigh & Hudson River Railway Company, and the
Lehigh & New England Railroad Company are substan-
tially abandoned in the Government's brief and, having
regard to the results arrived at with respect to the prin-
cipal defendants, the ends of justice will be best served
by dismissing the bill as to all of these defendants, with-
out prejudice, as was done by the District Court as to
all but the Wilmington and Northern Railroad Company,
as to which the dismissal was unqualified. A majority
of the individual defendants have died since the suit was
instituted and their successors in office have not been
made parties, and, since the conclusion to be announced
can be given full effect by an appropriate decree against
the corporation defendants, the case as against the remain-
ing individual defendants need not be considered, and as
to them the bill will be dismissed without prejudice.

We are thus brought to the consideration of what the
decree shall be with respect to the really important de-
fendants in the case, the three Reading companies, the
Central Railroad Company of New Jersey and the Wilkes-
Barre Coal Company.

Before the reorganization of 1896 the gathering of
more than two-thirds of the acreage of the Schuylkill
field into the control of the two Reading Companies was,
as their reports show, for the frankly avowed purpose,
then not forbidden by statute, of monopolizing the pro-
duction, transportation and sale of the anthracite coal
of the largest of the three sources of supply.

When in 1896 the problem was presented of reorganiz-
ing the financial affairs of the two companies, it was not
solved, as it might have been, by creating separate coal
and railroad companies to conduct independently inter-
state commerce in the two departments to which their
railroad and coal properties were adapted, but, on the

contrary, and very obviously for the purpose of evading the provision of the constitution of Pennsylvania prohibiting any incorporated common carrier from, directly or indirectly, engaging in mining "articles" for transportation over its lines (Constitution of Pennsylvania, 1874, Art. 17, § 5), and also of evading the provisions of the Federal Anti-Trust Act against restraining and monopolizing interstate commerce, resort was had to the holding company device, by which one company was given unrestricted control over the other two, with the power, inherent in that form of organization, of continuing and carrying forward the restraint and monopoly which had previously been acquired over that large volume of interstate commerce which was to be conducted by the coal and railroad companies.

Again, when in 1901 a rivalry, imaginary or real, arose for the control of the Central Railroad Company, the Holding Company, regardless of the law, did not hesitate to purchase control of that great competing anthracite coal carrying system, with its extensive coal owning and mining subsidiary. This acquisition placed the Holding Company in a position of dominating control not only over two great competing interstate railroad carriers but also over two great competing coal companies, engaged extensively in mining and selling anthracite coal, which must be transported to interstate markets over the controlled interstate lines of railway.

Again, and obviously, this dominating power was not obtained by normal expansion to meet the demands of a business growing as a result of superior and enterprising management, but by deliberate, calculated purchase for control.

That such a power, so obtained, regardless of the use made of it, constitutes a menace to and an undue restraint upon interstate commerce within the meaning of the Anti-Trust Act, has been frequently held by this court.

Thus, in *Northern Securities Co.* v. *United States*, 193 U. S. 197, 327, when dealing with a holding company, such as we have here, this court, in 1903, held:

"No scheme or device could more certainly come within the words of the act—'combination in the form of a trust or otherwise . . . in restraint of commerce among the several States or with foreign nations,'—or could more effectively and certainly suppress free competition between the constituent companies. . . . *The mere existence of such a combination and the power acquired by the holding company as its trustee, constitute a menace to, and a restraint upon, that freedom of commerce which Congress intended to recognize and protect*, and which the public is entitled to have protected."

And again, in *United States* v. *Union Pacific R. R. Co.*, 226 U. S. 61, 88, decided nine years later, in 1912, this court held:

"The consolidation of two great competing systems of railroad engaged in interstate commerce by transfer to one of a dominating stock interest in the other creates a combination which restrains interstate commerce within the meaning of the statute, because, in destroying or greatly abridging the free operation of competition theretofore existing, it tends to higher rates. . . . Nor does it make any difference that rates for the time being may not be raised and much money be spent in improvements after the combination is effected. *It is the scope of such combinations and their power to suppress or stifle competition or create monopoly which determines the applicability of the act.*"

It will suffice to add that this doctrine was referred to as the settled conclusion of this court, in 1914, when discussing a similar state Anti-Trust Act in *International Harvester Co.* v. *Missouri*, 234 U. S. 199, 209, it was said:

"The specification under this head is that the Supreme Court [of Missouri] found, it is contended, benefit—not

injury—to the public had resulted from the alleged combination. Granting that this is not an overstatement of the opinion the answer is immediate. *It is too late in the day to assert against statutes which forbid combinations of competing companies that a particular combination was induced by good intention and has had some good effect. . . .* The purpose of such statutes is to secure competition and preclude combinations which tend to defeat it."

Thus, this record clearly shows a group of men selecting the Holding Company with an "omnibus" charter and not only investing it by stock control with such complete dominion over two great competing interstate carriers and over two great competing coal companies extensively engaged in interstate commerce in anthracite coal as to bring it, without more, within the condemnation of the Anti-Trust Act, but it also shows that this power of control was actually used, once successfully, to suppress the building of a prospective competitive railway line, and a second time, successfully until this court condemned the 65% contracts as illegal, to suppress the last prospect of competition in anthracite production and transportation. To this it must be added that up to the time when this suit was commenced this Holding Company had continued in active, dominating control of the Reading Railway Company and of the competing Central Railroad system, and also of the two coal companies, thus effectually suppressing all competition between the four companies and pooling their earnings. It is difficult to imagine a clearer case and in all essential particulars it rests on undisputed conduct and upon perfectly established law. It is ruled by many decisions of this court, but specifically and clearly by *United States* v. *Union Pacific R. R. Co., supra.*

For flagrant violation of the first and second sections of the Anti-Trust Act, the relations between the Reading

Company, the Reading Railway Company and the Read-
ing Coal Company and between these companies and the
Central Railroad Company of New Jersey must be so
dissolved as to give to each of them a position in all re-
spects independent and free from stock or other control
of either of the other corporations.

With respect to the contention that the commodities
clause of the Act of June 29, 1906, 34 Stat. 584, 585, is
being violated by the Reading Railway Company and
the Central Railroad Company:

The Circuit Judges centering their attention: upon the
fact that the Reading Railway Company did not own
any of the stock of the Reading Coal Company; that the
two companies had separate forces of operatives and
separate accounting systems; and upon the importance
of maintaining "the theory of separate corporate entity"
as a legal doctrine, concluded, upon the authority of
*United States* v. *Delaware & Hudson Co.*, 213 U. S. 366,
413, that the evidence did not justify holding that in
transporting the products of the Reading Coal Com-
pany's mines to market the Reading Railway Company
was carrying a commodity "mined, or produced by it, or
under its authority" or which it owned "in whole, or in
part," or in which it had "any interest direct or indirect."

But the question which we have presented by this
branch of the case is not the technical one of whether
ownership by a railroad company of stock in a coal com-
pany renders it unlawful for the former to carry the product
of the latter, for here the railroad company did not own
any of the stock of the coal company. The real question
is whether combining in a single corporation the owner-
ship of all of the stock of a carrier and of all of the stock
of a coal company results in such community of interest
or title in the product of the latter as to bring the case
within the scope of the provisions of the act.

The purpose of the commodity clause was to put an

end to the injustice to the shipping public, which experience had shown to result from discriminations of various kinds, which inevitably grew up where a railroad company occupied the inconsistent positions of carrier and shipper. Plainly in such a case as we have here this evil would be present as fully as if the title to both the coal lands and the railroads were in the Holding Company, for all of the profits realized from the operations of the two must find their way ultimately into its treasury,—any discriminating practice which would harm the general shipper would profit the Holding Company. Being thus clearly within the evil to be remedied, there remains the question whether such a controlling stock ownership in a corporation is fairly within the scope of the language of the statute.

In terms the act declares that it shall be unlawful for any railroad company to transport in interstate commerce "any article or commodity . . . mined, or produced by it, or under its authority, or which it may own in whole, or in part, or in which it may have any interest direct or indirect."

Accepting the risk of obscuring the obvious by discussing it, and without splitting hairs as to where the naked legal title to the coal would be when in transit, we may be sure that it was mined and produced under the same "authority" that transported it over the railroad. All three of the Reading companies had the same officers and directors and it was under their authority that the mines were worked and the railroad operated, and they exercised that authority in the one case in precisely the same character as in the other—as officials of the Holding Company. The manner in which the stock of the three was held resulted, and was intended to result, in the abdication of all independent corporate action by both the Railway Company and the Coal Company, involving as it did the surrender to the Holding Company of the en

tire conduct of their affairs. It would be to subordinate reality to legal form to hold that the coal mined by the Coal Company, under direction of the Holding Company's officials, was not produced by the same "authority" that operated the Reading Railway lines. The case falls clearly within the scope of the act, and for the violation of this commodity clause, as well as for its violation of the Anti-Trust Act, the combination between the Reading Railway Company and the Reading Coal Company must be dissolved.

The relation between the Central Railroad Company and the Wilkes-Barre Coal Company presents a different question, for here the Railroad Company owns over eleven-twelfths of the stock of the Coal Company, and therefore the holding in 213 U. S. 366, *supra*, is especially pressed in argument,—that the ownership of stock by a railroad company in a coal company does not cause the former to have such an interest in a legal or equitable sense in the product of the latter as to bring it within the prohibition of the act. But this holding was considered in *United States* v. *Lehigh Valley R. R. Co.*, 220 U. S. 257, 272, and it was there held not applicable where a railroad company used its stock ownership for the purpose of securing a complete control over the affairs of a coal company, and of treating it as a mere agency or department of the owning company. This rule was repeated and applied in *United States* v. *Delaware, Lackawanna & Western R. R. Co.*, 238 U. S. 516, 529. It results that it may confidently be stated that the law upon this subject now is, that while the ownership by a railroad company of shares of the capital stock of a mining company does not necessarily create an identity of corporate interest between the two such as to render it unlawful under the commodities clause for the railroad company to transport in interstate commerce the products of such mining company, yet where such ownership of stock is resorted to, not for

the purpose of participating in the affairs of the corporation in which it is held in a manner normal and usual with stockholders, but for the purpose of making it a mere agent, or instrumentality or department of another company, the courts will look through the forms to the realities of the relation between the companies as if the corporate agency did not exist and will deal with them as the justice of the case may require. *United States v. Lehigh Valley R. R. Co.*, 220 U. S. 257, 272, 273; *United States v. Delaware, Lackawanna & Western R. R. Co.*, 238 U. S. 516, 529; *Chicago, Milwaukee & St. Paul Ry. Co. v. Minneapolis Civic & Commerce Association*, 247 U. S. 490, 501.

Applying this rule of law to the relation between the Central Railroad Company and the Wilkes-Barre Coal Company, with the former owning over eleven-twelfths of the capital stock of the latter and using it as the coal mining department of its organization, we cannot doubt that it falls within the condemnation of the commodities clause and that this relation must also, for this reason, be dissolved.

It results that the decree of the District Court will be affirmed, as to the Lehigh Coal and Navigation Company, the Lehigh and New England Railroad Company, the Lehigh and Hudson River Railway Company, as to the restrictive covenants in the mining leases with respect to the shipping of coal, as to the dissolution of the combination between the Philadelphia and Reading Coal and Iron Company and the Lehigh and Wilkes-Barre Coal Company, maintained through the Reading Company and the Central Railroad Company of New Jersey. As to the Wilmington and Northern Railroad Company and as to the individual defendants, the bill will be dismissed without prejudice. As to the Reading Company, the Philadelphia and Reading Railway Company, the Philadelphia and Reading Coal and Iron Company and the

Central Railroad Company of New Jersey, the decree of the District Court will be reversed and the cause remanded with directions to enter a decree in conformity with this opinion, dissolving the combination of the Reading Company, the Philadelphia and Reading Railway Company, the Philadelphia and Reading Coal and Iron Company, the Central Railroad Company of New Jersey and the Lehigh and Wilkes-Barre Coal Company, existing and maintained through the Reading Company, with such provision for the disposition of the shares of stock and bonds and other property of the various companies, held by the Reading Company, as may be necessary to establish the entire independence from that company and from each other, of the Philadelphia and Reading Railway Company, the Philadelphia and Reading Coal and Iron Company, the Central Railroad Company of New Jersey and the Lehigh and Wilkes-Barre Coal Company, and also that such disposition shall be made by the decree of the stocks and bonds of the Lehigh and Wilkes-Barre Coal Company, held by the Central Railroad Company of New Jersey, as may be necessary to establish entire independence between these two companies to the end that the affairs of all of these now combined companies may be conducted in harmony with the law.

*Affirmed in part; reversed in part, and remanded with direction to enter a decree in conformity with this opinion.*

MR. CHIEF JUSTICE WHITE, MR. JUSTICE HOLMES and MR. JUSTICE VAN DEVANTER, dissenting.

Except in so far as the decree below commanded a separation of interest between the Central Railroad of New Jersey and the Lehigh & Wilkes-Barre Coal Company, the court below dismissed, for want of equity, the bill of the United States brought to sever the existing relations

26. WHITE, Ch. J., HOLMES and VAN DEVANTER, JJ., dissenting.

between the Reading Company, the Philadelphia & Reading Railway Company, the Philadelphia & Reading Coal & Iron Company, the Central Railroad of New Jersey, the Lehigh & Wilkes-Barre Coal Company, and other corporations, on the ground that the relations between those companies resulted in a monopoly or combination in restraint of trade in violation of the Sherman Act and gave rise to a disregard of the commodities clause of the act of Congress.

By the opinion now announced, this action of the court below, in so far as it directed a dismissal, is reversed and virtually the full relief prayed by the Government is therefore granted. We are unable to concur in this conclusion because in our opinion neither the contentions as to the Sherman Act, nor the reliance upon the commodities clause, except to the extent that in the particulars stated they were sustained by the court below, have any foundation to rest upon. We do not state at any length the reasons which lead us to this view because the court below, composed of three circuit judges, in a comprehensive and clear opinion announced by McPherson, Judge, sustains the correctness of the action which it took and also demonstrates the error involved in the decree of this court reversing its action. *United States* v. *Reading Co.*, 226 Fed. Rep. 229. To that opinion we therefore refer as stating the reasons for our dissent.