## GILLIS v. JENKINS PETROLEUM PROCESS CO.

### No. 7667.

Circuit Court of Appeals, Ninth Circuit.
June 1, 1936.

Goudge, Robinson & Hughes, Ernest C. Carman, and Frank L. A. Graham, all of Los Angeles, Cal., for appellant.

Harold A. Jones, of Los Angeles, Cal., and Donovan, Bond & Leisure, C. Stanley Thompson, and Frederick Schafer, all of Washington, D. C., for appellee.

Before WILBUR, DENMAN, and MATHEWS, Circuit Judges.

DENMAN, Circuit Judge.

The question on this appeal concerns a liability asserted by Jenkins Petroleum Process Company, a Wisconsin corporation, hereinafter called Jenkins, against Robert C. Gillis, receiver of Western Oil & Refining Company, a Nevada corporation, hereinafter called Western. The claimed obligation of the receiver to Jenkins is predicated upon the receiver's use of certain petroleum process patents owned by Jenkins, who seeks to impose against the receiver a licensee liability arising out of such use. The receiver denies that he is a licensee.

For a number of years Western has owned and operated an oil refinery at Wilmington, Cal. During 1926 and 1927, conversations were had between officers of Western and Jenkins relating to the installation in the refinery of two so-called Jenkins cracking units or "cracking stills" designed to increase the efficiency of the petroleum refining process. The processes governing the use of the stills were covered by patents owned by Jenkins. The stills themselves were being sold at the time in question by Graver Corporation which, in its business operations, was closely affiliated with Jenkins. Whenever a still was sold by Graver, a contract was made between Jenkins and the vendee of the still giving the vendee a license to use the patents.

Negotiations were had among the officers of Western, Jenkins, and Graver, and concern was expressed on the part of Western lest the installation and operation of a Jenkins still at the Wilmington refinery subject Western to unfavorable patent litigation. At this point it was suggested by one of the executive officers of Graver that in order to avoid such a possible consequence Western should organize a separate corporation to take over the legal title to the stills and the patent license contracts.

This was the plan followed. By a series of transactions which need not be detailed here, the permanent working arrangement was established in this manner: Western, or certain of its officers and directors, organized under the laws of Nevada the Petrolgas Company. Only five shares of Petrolgas were issued; these going to Anglo-American Company in return for $500. Anglo-American was another Nevada corporation, its entire stock was owned by certain Western directors, and, apparently, it had no function other than to hold title to the total issued capital stock of Petrolgas. The entire staff of Petrolgas officers and directors, from the date of its organization until it went out of business, were officers or directors of Western. The organization of Petrolgas took place in April, 1928, and the permanent working arrangement was established by the spring of 1930.

Petrolgas became the owner of two Jenkins stills and of two licenses issued by Jenkins, one for each still. Each license contract gave the licensee the nonexclusive right to use certain specified processes; the right being restricted, however, to the particular still which the license accompanied.

By the terms of each contract, the licensee covenanted to pay to the licensor a royalty of 25 cents per barrel of petroleum products processed under the patent. Each contract contained a provision regulating assignability. With minor differences in phraseology, the assignability provision in each license contract is the same as in the other. Hence we quote but one: "Personal License: It is mutually understood and agreed that this license is personal to Licensee, hereunder, and shall not be assigned nor transferred by it or any rights granted it hereunder transferred to others, without the written consent of Licensor first had and obtained, provided, only, that in the event of the sale or transfer of the present refinery of Licensee, to which cracking units constructed hereunder shall be auxiliary, such units may be sold and transferred with such refinery, and the rights of Licensee hereunder conveyed to such purchaser; and in such event, Licensee shall notify Licensor in writing of such transfer, and such purchaser shall be subject to all the terms and conditions of this contract."

The financing of the deal by which Petrolgas purchased the stills from Graver was consummated through Credit Alliance Corporation, assignee of Graver's rights under the contract of conditional sale by which Graver had sold the stills to Petrolgas. Credit Alliance took promissory notes from Petrolgas for the unpaid purchase price and reserved legal title in the stills as security. In addition to this, Western guaranteed to Credit Alliance the obligations of Petrolgas to Credit Alliance. Previously Western had guaranteed to Jenkins the performance of the licensee's obligations under the license contracts. These guarantees had been executed before the licenses had been transferred to Petrolgas, when they were in the hands of certain temporary organizations set up by Western for the purpose of getting the licenses to Petrolgas. This guarantee to Jenkins on the part of Western was considered, by Jenkins at any rate, to cover the obligations of Petrolgas under the licenses.

Western leased to Petrolgas certain property contiguous to Western's Wilmington refinery and the stills were set up on the leased premises. An operating agreement was drawn between Western and Petrolgas, by which Petrolgas agreed to process all petroleum products delivered to it by Western and to sell the entire processed product to Western at cost plus 10 per cent. This provision for compensation was stipulated to be only a temporary arrangement for an experimental period, to be replaced after such period by a plan based upon detailed study of operations. Petrolgas agreed to maintain consistently upon its board of directors, apparently comprising five members, two nominees of Western. The agreement was to run for twenty years, with an option on the part of Western to terminate it at any time before the expiration of the twenty-year period by taking over the properties of Petrolgas at actual cost less depreciation. Pursuant to this agreement and to the terms of the Jenkins patent licenses, Petrolgas pursued the business of receiving crude oil from Western, processing it in the Jenkins stills under the processes covered by the patent licenses and selling the finished product back to Western. Petrolgas maintained its offices in a portion of the suite which for the most part consisted of Western's offices; but, apart from this fact and the fact that the officers and directors (and several employees) of Petrolgas were officers or directors (and employees) of Western, the relationship between the two corporations was characterized by incidents showing separate corporate entities. Each had its separate stock book, pay roll, and files. The funds of the two corporations were never commingled. Each made its separate tax returns. Western carried the insurance upon the properties of all its subsidiaries, including Petrolgas, but billed proportional amounts of the premiums against each.

Jenkins always dealt with Petrolgas as a separate corporation. All checks for royalty payments under the license agreements were signed by Petrolgas and sent to Jenkins inclosed in Petrolgas stationery. Much correspondence was had between Jenkins and Petrolgas regarding various problems arising in connection with the operation of the stills, and there was nothing in such correspondence indicating that Jenkins considered Petrolgas only an agent or instrumentality of Western or considered Western the real licensee under the Jenkins patents. In a letter written by Jenkins to Western directly in September, 1929, Western is mentioned as a licensee. But Western immediately responded to this communication pointing out that it was not such. And as late as November 30, 1931, Jenkins wrote Gillis, receiver of Western, asserting a claimed obligation of Western as guaran-

tor of the obligations of Petrolgas under the license contracts, thus demonstrating that at that time it considered Western distinct from Petrolgas.

Petrolgas did not make a financial success of its operations with the stills. The proceeds from the processing did not return enough to meet the payments on the notes which had been given to Credit Alliance for the purchase price of the stills and, in order to meet these payments, sums of money were advanced from time to time by Western to Petrolgas. By April of 1931, these advances totaled $200,000.

On April 3, 1931, Robert C. Gillis was appointed receiver of Western. When this receivership supervened Western ceased its advances to Petrolgas, whereupon Petrolgas promptly defaulted in its obligations to Credit Alliance. On April 20, 1931, Gillis was appointed receiver of Petrolgas.

Gillis never operated the stills in his capacity of receiver of Petrolgas. The object of that receivership was to liquidate the corporation. All creditors of Petrolgas, including Jenkins, but with the exception of Western and of Credit Alliance, received dividends in final settlement of their claims. The final settlement of matters between Western, Petrolgas, and Credit Alliance was carried out in accordance with a plan of the receiver, approved by the court. Credit Alliance foreclosed its lien on the stills and sold them to the receiver of Western for $330,541.35, the value at which they were appraised in the Petrolgas receivership. This amount was paid in receiver's certificates issued by the receiver of Western. In addition to selling the stills, Credit Alliance loaned the Western receiver $150,-000, taking certificates in return therefor. $25,000 was given by the receiver of Western to the receiver of Petrolgas for operating expenses of the Petrolgas receivership. This was the first part of the deal and was completed in August, 1931, at which time the stills came into the possession of the receiver of Western. This transaction settled matters between Petrolgas and Credit Alliance.

There still remained a debt owing from Petrolgas to Western. The discharge of this obligation and the complete liquidation of Petrolgas were accomplished by a transfer of the entire remaining assets of Petrolgas to Western. The court approved such liquidation and transfer by an order of February 18, 1932, and the same was accomplished by a bill of sale transferring Petrolgas' entire remaining assets to Western on April 19, 1932. We quote the pertinent portion of the bill of sale:

"* * * The undersigned, Petrolgas Company * * * and Robert C. Gillis, Receiver of the Petrolgas Company * * * have sold, assigned, and transferred, and do hereby sell, assign, transfer and set over unto the Western Oil and Refining Company all right, title and interest the undersigned, or either of them, have or may have in and to all of that certain property particularly described as follows, to-wit: [Here follows a description of the two cracking stills]

"together with any and all other assets, real, personal and mixed, wherever the same may be situated, including any and all leases and fee simple interest in land.

"It is a provision hereof that the enumeration specifically of the Jenkins Units hereinabove described shall not be nor be construed to be as all inclusive, but it is the intent and purpose of the within bill of sale to sell, assign and transfer unto the Western Oil and Refining Company all right, title and interest the undersigned have in and to any and all assets, both real, personal and mixed, whether the same be herein described or otherwise.

"To have and to hold unto the Western Oil and Refining Company, its successors and assigns forever."

Before the completion of this final liquidation of Petrolgas and the transfer of all remaining assets to Western, Gillis, in his capacity of receiver of Western, had commenced using the two Jenkins stills under the Jenkins process patents to produce gasoline. This use commenced in January, 1932, and continued up to February 9, 1934. It is the 25 cents per barrel royalty for this period that Jenkins seeks to collect from Gillis in this proceeding. The amount of barrels produced and the royalties owing thereon for each month, if any are found to be owing, have been stipulated by the parties.

We now turn to a consideration of certain correspondence passing between Jenkins and Gillis.

November 21, 1931: Gillis, in his capacity of receiver of Petrolgas, wrote Jenkins requesting information as to possible alterations in the Jenkins stills for the purpose of increasing their efficiency. At the time this letter was written the stills had passed to Gillis as receiver of Western.

November 30, 1931: Jenkins wrote the receiver of Western inquiring as to the possibility of filing a claim against Western on its alleged guarantee of the obligation of Petrolgas to Jenkins under the license contracts.

December 11, 1931: The receiver's attorney answered, saying that Western had not guaranteed the obligations of Petrolgas; that even if it had incurred such an obligation, it was discharged by Jenkins' acceptance of a dividend in the Petrolgas receivership; that in any case a claim at this time came too late, inasmuch as the time fixed by the court for filing claims in the Western Receivership had expired. Continuing, this letter stated: "And if when the Receiver may hereafter find it advantageous to operate the Jenkins Process Cracking Plants, formerly belonging to the Petrolgas Company, Ltd. but sold by Credit Alliance Corporation to the Receiver of Western Oil and Refining Company last July, the Receiver will be glad to make a new contract with you for payment of the usual license fees covering any such operations which he may undertake as Receiver; which contract, of course, would be an operating expense of the Receiver and entitled to priority in payment over any debt of the Western Oil and Refining Company existing at the time the Receiver was appointed."

April 14, 1932: Jenkins' attorney wrote the Western receiver's attorney, noting the fact that the Western receiver had been using the stills and the Jenkins processes for three months; referred to the receiver's letter of December 11, 1931, relative to the making of a new license contract should the receiver desire to use the stills, and in that connection stated:

"Apparently the matter of arranging for a license and for the payment of the usual royalties for the use and operation of the Jenkins stills escaped the attention of the Receiver when he decided to start operating the stills. * * *

"It does not appear to us, however, that it is necessary to issue a new license to the Receiver for the Western Oil and Refining Company for the operation of the two (2) Jenkins stills by the Receiver.

" * * * You will note that each license provides that in the event of the sale, transfer or assignment of the licensee's entire refining plant, including the cracking units to which the license agreements relate, the rights of the licensee may be transferred and conveyed to the purchaser, transferee or assignee of such entire plant, provided that such purchaser, transferee or assignee shall agree in writing to be subject to the terms and conditions of this agreement.

"On account of the provisions of the existing license agreements, it has appeared to us that it is not necessary to issue a new license agreement to the Receiver of the Western Oil and Refining Company. In any event, an assignment of the license agreements executed by the Receiver for the Petrolgas Company and accepted by the Receiver for the Western Oil and Refining Company should be entirely sufficient to protect the interests of every party concerned in the matter. If you have such an assignment executed, I will appreciate it very much if you will have a duplicate original sent to the Jenkins Company in order that it may be attached to the original license agreements. As a practical matter, however, a formal assignment of the license agreement with the Jenkins Company has not been executed in connection with most transfers of the cracking units to which the licenses relate, but the sending and acceptance of reports and of royalties has been considered sufficient to substitute the new owner of the cracking unit as the licensee under the license agreement. The Jenkins Company therefore has regarded the transfer of the plant as sufficient to transfer the rights of the Petrolgas Company under its license agreements to the Receiver of the Western Oil and Refining Company."

July 12, 1932: Jenkins wrote Western enclosing supplements to be attached to "your" license agreements.

July 20, 1932: Attorney for Western receiver answered, saying:

"The Western Oil and Refining Company does not have any license whatsoever from you covering any process whatsoever at the present time and, as the Receiver is advised by executives of that company, never has had any such license. Therefore, there is nothing to which the said two riders described as 'Supplement B' could be attached.

"In any event, the Receiver of Western Oil and Refining Company, who is now in possession of the company and all of its assets and property and is operating the same under directions of the United States District Court for the Southern District of California, Central Division, has no license

agreement with you to which any such riders can be attached and, therefore, is not interested in the same."

In its petition for intervention (serving also as a bill of intervention) Jenkins asserted that Gillis, as receiver of Western, had been operating the stills under the Jenkins patents since January, 1932, as a licensee of Jenkins and was accordingly liable for the 25 cents per barrel royalty. Jenkins' assertion of licensee liability was based upon the theory that the license contract with Petrolgas was in reality an asset of Western, because, it was said, Petrolgas was nothing but an agent or instrumentality of Western; and upon the alternative theory that the transfer of the stills to Western from Credit Alliance plus the transfer of all assets of Petrolgas to Western operated to transfer the license contracts to Western. Hence, urged the intervener, Western in one way or another held the licenses and the same passed to Gillis by virtue of the receivership; and when Gillis operated the stills under the Jenkins processes he became liable for the specific license royalties.

The receiver did not deny that he used Jenkins processes in operating the stills, but denied that he was a licensee. In the first place, he urged, the licenses were issued to Petrolgas, not Western; they were distinct corporate entities and one was by no means a mere instrumentality or department of the other. Secondly, the receiver contended that the Petrolgas-Jenkins licenses were never validly transferred to Western or to himself as receiver of Western. Hence, it is urged, his liability for the use of the processes, if any, is that of an infringer, not a licensee.

The District Court found for Jenkins, holding that Petrolgas was no more than a department of Western and hence that Western was at all times the obligor under the Jenkins license contracts; and that the use of the stills by the receiver, succeeding to the properties of Western, obligated him as licensee. The court also found that the licenses had passed from Petrolgas to the receiver of Western by virtue of the bill of sale of April 19, 1932, transferring to Western the entire remaining assets of Petrolgas. The District Judge did not make separate findings of fact and conclusions of law, but stated the foregoing conclusions in a memorandum opinion. His conclusions are in effect conclusions of law, not findings of fact, inasmuch as they state the judge's concept of the legal effect of the facts we have set out, about which facts there is no dispute. In his final decree, the judge awarded intervener Jenkins $91,007.89, with interests and costs. That figure was stipulated by the parties to represent the total royalties owing, if any are owing, by virtue of the receiver's operation of the stills between January, 1932, and February 9, 1934. The receiver appeals.

As we have said, the essential facts in this case are not in dispute, and we have set them out in some detail in order to present a clear picture of the transactions resulting in the present controversy. In the light of these complete facts, we believe the case presents little difficulty. We conclude:

A. That Western was not a licensee of Jenkins by virtue of the close relationship between Western and Petrolgas, the ostensible licensee, and hence that no liability of the receiver of Western can be predicated upon that relationship.

B. That Western (and consequently its receiver) succeeded to the license contracts with Jenkins by virtue of the April 19, 1932, transfer of all assets of Petrolgas to Western, and that hence all use of the processes covered by the licenses by the receiver after that date subjected him to the obligation of paying the stipulated royalty to Jenkins.

A. Western was not a licensee of Jenkins by virtue of the close relationship existing between Western and Petrolgas.

We see no reason to disregard the separate corporate entities of Western and Petrolgas. Much is made by Jenkins of the fact that the two corporations had common officers and directors and had offices in the same suite. It is also thought by Jenkins to be of profound significance that persons high in the affairs of Western procured the incorporation of Petrolgas. We are not impressed by these arguments. Wholly disregarding the undisputed testimony to the effect that an official of Graver Corporation, an affiliate of Jenkins, himself suggested the incorporation of a subsidiary for Western, we think it well settled law that the organization of one company by another, or the ownership of all the stock of one company by another, or common officers and directors, or all these elements combined, are not sufficient to defeat separate corporate entity. Martin v. Development Company of America (C.

C.A.-9) 240 F. 42, 45; Haskell v. McClintic-Marshall Co. (C.C.A.-9) 289 F. 405, 413; Finn v. George T. Mickle Lumber Co. (C.C.A.-9) 41 F.(2d) 676, 677; Owl Fumigating Corp. v. California Cyanide Co. (D. C.Del.) 24 F.(2d) 718, 720, affirmed (C.C. A.-3) 30 F.(2d) 812, 813.

There are, of course, situations calling for disregard of the corporate entity. Jenkins has cited many such cases. Some of them are instances where too close a relationship between two or more corporations offends a statute or circumvents public policy. Chicago, Milwaukee & St. Paul Ry. v. Minneapolis Civic & Commerce Ass'n, 247 U.S. 490, 501, 38 S.Ct. 553, 62 L.Ed. 1229; U. S. v. Reading Co., 253 U. S. 26, 39, 40 S.Ct. 425, 64 L.Ed. 760. See, also, Metropolitan Holding Co. v. Snyder (C.C.A.-8) 79 F.(2d) 263, 265. No such question is involved here. Apart from the public aspect of the problem, corporate entity will be disregarded when necessary to prevent fraud upon a private party or when one company is, in fact, nothing but the agent of another. Neither such situation obtains here. There is no assertion that Jenkins was in the slightest measure misled into thinking that the relationship between Western and Petrolgas was other than it was, and not the slightest evidence that Jenkins was in any way damaged even if it had been so misled. Up to a late hour in the receivership proceedings, Jenkins apparently considered itself protected in its dealings with Petrolgas by a guarantee issued by Western, and there is no evidence that it was not so protected had it wished to assert its rights to the guarantee in due season.

Nor are we able to discern in the relations between Western and Petrolgas any elements which made the latter nothing but an agency or instrumentality of the former. The licenses were issued to Petrolgas. Petrolgas entered into an operating agreement with Western which bore no marks of an agent's contract with his principal, but was, rather, a perfectly open, arm's length contract between two independent contracting parties. We are unable to see in this contract or in the operations carried out in pursuance thereof any practical effects differing from what would have been the result of dealings for a similar purpose between Western and a corporation which none of Western's officers had ever before heard of.

What the Supreme Court has recently said of the relationship between a corporation and its stockholders is presently apposite: "As a general rule a corporation and its stockholders are deemed separate entities. * * * Of course, the rule is subject to the qualification that the separate identity may be disregarded in exceptional situations where it otherwise would present an obstacle to the due protection or enforcement of public or private rights. But in this case we find no such exceptional situation." New Colonial Ice Co. v. Helvering, 292 U.S. 435, 442, 54 S.Ct. 788, 791, 78 L.Ed. 1348.

B. The receiver of Western became a licensee of Jenkins by virtue of the transfer of all assets of Petrolgas to Western on April 19, 1932; and his use of the Jenkins process after that date subjected him to the royalty obligations specified in the licenses.

The parties have argued at some length with regard to the effect of this transfer of assets. We see no great difficulty in interpreting its legal effect. In order to reduce the situation to its essentials we requote the pertinent provisions of certain relevant documents.

The patent license issued to Petrolgas by Jenkins provided: "It is mutually understood and agreed that this license is personal to Licensee, hereunder, and shall not be assigned nor transferred by it or any rights granted it hereunder transferred to others, without the written consent of Licensor first had and obtained. * * *"

On April 14, 1932, the attorney for Jenkins wrote the attorney for Western, saying: "On account of the provisions of the existing license agreements, it has appeared to us that it is not necessary to issue a new license agreement to the Receiver of the Western Oil and Refining Company. In any event, an assignment of the license agreements executed by the Receiver for the Petrolgas Company and accepted by the Receiver for the Western Oil and Refining Company should be entirely sufficient to protect the interests of every party concerned in the matter."

On April 19, 1932, Petrolgas and its receiver transferred the entire remaining assets of Petrolgas (which perforce included the Jenkins contracts) to Western by a bill of sale which read: "* * * It is the intent and purpose of the within bill of sale to sell, assign and transfer unto the Western Oil and Refining Company all right, title and interest the undersigned have in and to any and all assets, both real,

personal and mixed, whether the same be herein described or otherwise."

Here is a plain assignment in strict accordance with the terms of the original license agreement. A transfer of all the assets of Petrolgas necessarily included its license contracts; and the letter of April 14 from Jenkins' attorney places it beyond doubt that the consent of the licensor was first had and obtained.

The receiver's brief discusses the alternative provision for assignability contained in the licenses, making them assignable, with certain restrictions, whenever the refinery of the licensee was transferred. The receiver's argument is that the restrictions on this form of assignment were not complied with. The intervener Jenkins apparently agrees with this position, but replies that the restrictions were for the benefit of the licensor and could be waived by it. The trial court so concluded. We think this conclusion correct, but do not find it necessary, inasmuch as the license agreements were adequately transferred according to their terms, as we have pointed out above.

■ The receiver argues with considerable vigor that the transfer of Petrolgas assets to Western, conceding that it sufficed to pass the licenses to him, did not operate to transfer to him the liabilities of the licensee. Loose v. Bellows Falls Pulp Plaster Co. (C.C.A.-2) 266 F. 81, 84. It is possible, of course, for a licensee to transfer the benefits of a license and retain the burdens. Here, however, we are concerned not with a mere transfer of a license, but with the assignment of an entire contract. The terms of the contract as well as the circumstances of its assignment fully support the finding of the trial court that the use by the receiver of the stills under the licenses after the assignment of the contracts was an assumption of their burden. We do not see how he could have found otherwise. The receiver had become the holder of the license contracts by transfer from a company that was being liquidated and which, for that reason, was obviously unable to continue royalty payments. In addition, a few months before the transfer, the receiver had written Jenkins saying that if hereafter the receiver may "find it advantageous to operate the Jenkins Process Cracking Plants * * * the Receiver will be glad to make a new contract with you for payment of the usual license fees." Jenkins had acknowledged this letter in April, saying that no new contract was nec-

essary; that an assignment of the licenses would be sufficient. Thereafter the license contracts were assigned and the receiver did "find it advantageous to operate the Jenkins Process Cracking Plants" for the better part of two years. It would be hard to find a clearer case of the assumption of a contract obligation.

■ One further contention of the receiver remains to be considered. The order appointing Gillis receiver of Petrolgas on April 20, 1931, gave the receiver six months from that date to decide which contracts of Petrolgas he would affirm or disaffirm. Gillis never affirmed the license contracts of Petrolgas. The six months had elapsed considerable time prior to the transfer of Petrolgas assets to Western. Hence, it is argued, the licenses were dead for lack of affirmance by the Petrolgas receiver within six months. Samuels v. E. F. Drew & Co. (C.C.A.-2) 292 F. 734, 739, is cited for the proposition that contracts of a receiver's principal die within the time specified for the receiver's affirmance or disaffirmance if, up to the end of that time, the receiver neglects positively to affirm them.

This argument is apparently an afterthought of the receiver. For in November, 1931, seven months after the time fixed for disaffirmance of the contracts of Petrolgas, Gillis, as receiver of Petrolgas, wrote Jenkins requesting information as to the more efficient use of the stills, thus demonstrating that at that time he did not consider the contracts dead. Furthermore, the order of the court approving the final liquidation of Petrolgas and the transfer of all its assets to Western clearly demonstrated that the court considered the license contracts alive when it made the order in February, 1932; inasmuch as the licenses were practically the only thing of value that Petrolgas could have had still remaining, the cracking stills having previously been transferred to Western. This order of the court would serve to extend the time for affirmance or disaffirmance if such were necessary.

■ But aside from all this the receiver's argument misconstrues the principle governing a receiver's affirmance of his principal's contracts. Samuels v. E. F. Drew & Co., supra, deals with a situation where at the time of the supervening of receivership the insolvent concern was obligated under contract to receive and pay for the deliveries of certain products. An executory obligation rested upon the insolvent, and it was necessary for the receiver to

adopt and perform such obligation or to disaffirm the same and respond in damages. What the receiver must affirm or disaffirm is an obligation of the insolvent. In the case of the licenses in this case there was no obligation resting upon Petrolgas under the licenses save what it had previously incurred by use of the processes covered by them. So far as the state of affairs after receivership was concerned, Petrolgas was under no obligation because it did not use the licenses. The license contracts imposed no obligation save in the event of the use of the licensed processes. Hence there was nothing to affirm or disaffirm. Obviously, the failure of the Petrolgas receiver to affirm an obligation which did not exist cannot operate to extinguish a license which might have imposed an obligation had the receiver chosen to avail himself of its benefits.

The District Court was in error in holding that the receiver was a licensee during the months of January, February, and March, 1932, inasmuch as the license contracts were not transferred to him until April. No gasoline was produced by the receiver during April and May. Hence the receiver's licensee liability must be computed as beginning in June, 1932.

Since the taking of this appeal the receiver may have used the Jenkins stills and processes for a time longer than is specified in the decree below. We hence refrain from affirming the decree as modified, but order the cause remanded, with directions to settle the rights of the parties in accordance with the views expressed in this opinion.

Reversed.