**HAZELTINE CORPORATION v. GENERAL ELECTRIC CO. et al.**

Nos. 2466, 2467.

District Court, D. Maryland.

July 17, 1937.

Henry T. Kilburn, of New York City, and Eben J. D. Cross, of Baltimore, Md., for plaintiff.

Stephen H. Philbin and William J. Barnes, both of New York City, and Gaylord Lee Clark and Semmes, Bowen & Semmes, all of Baltimore, Md., for defendants.

COLEMAN, District Judge.

These two suits, which have been consolidated, relate to alleged infringement of four patents on radio apparatus owned by the plaintiff. There are two defendants. One of them, the General Electric Company, appeared specially and moved to dismiss the bill of complaint in each case on the ground that it had committed no acts of infringement within the District of Maryland, and that therefore this court has no jurisdiction to entertain a suit against it under the provisions of section 48 of the Judicial Code (28 U.S.C.A. § 109). These motions, supported by affidavits, were denied, this court concluding that the question raised should be decided after hearing testimony, since the plaintiff claimed that the General Electric Company had committed not merely direct acts of infringement within the state of Maryland, but had infringed indirectly through sales made by the other defendant, the General Electric Supply Corporation, for which, as plaintiff alleged, General Electric Company is responsible, because it owns the entire stock of the supply corporation, directs its policies, and, in general, controls its business.

Leave was granted to General Electric Company, upon its motions being overruled, to answer the bills of complaint which again raise the issue of jurisdiction, and this question was heard separately, extensive testimony was taken, oral argument heard, and briefs filed.

There are thus presented to the court at this time two questions for determina-

tion: (1) Has the General Electric Company, which, for convenience, will hereinafter be referred to as the electric company, itself committed, directly, any acts of infringement in the state of Maryland? and (2) Are the activities in Maryland of the General Electric Supply Corporation, hereinafter referred to, for convenience, as the supply company, to be treated as the activities of the electric company, so as to make the latter responsible for any acts of infringement by the former in Maryland?

Both questions are governed by the provisions of section 48 of the Judicial Code (28 U.S.C.A. § 109), the pertinent parts of which are as follows: "In suits brought for the infringement of letters patent the district courts of the United States shall have jurisdiction, in law or in equity, in the district of which the defendant is an inhabitant, or in any district in which the defendant, whether a person, partnership, or corporation, shall have committed acts of infringement and have a regular and established place of business."

■ We will consider the two questions in the order in which they have been stated. As to the first, since the electric company is a New York corporation, it is not "an inhabitant" of the District of Maryland. But it is admitted that it has a regular and established place of business within the Maryland district. Therefore, the question is this: Has it, itself, "committed acts of infringement" within the Maryland district? The existence both of a regular and established place of business, and the commission of such acts is a condition precedent to assumption of jurisdiction by this court.

■ The only evidence that the electric company itself committed acts of infringement in Maryland is a letter, introduced by the plaintiff, written by the sales' manager of the radio department of the electric company at Schenectady, N. Y., to the electric company's counsel, and given by him to plaintiff's counsel, which is to the effect that the electric company "sold * * * to the United States Coast Guard some receiving and transmitting apparatus, delivery of which was made to the Supply Depot at Curtis Bay, Maryland." The evidence remains in this meager state. The terms of the contract of sale were not proven, so that it is not clear as to exactly where title passed, that is, whether in Maryland or in Schenectady, N. Y., where the apparatus was manufactured and whence it was shipped, the presumption, however, being that it passed at the place of shipment. Furthermore, there was no evidence introduced to identify the particular apparatus, and therefore it is not shown whether, assuming the patents in suit to be valid, this apparatus infringed. But, conceding, as we must, that the Coast Guard is an agency or instrumentality of the United States, Panhandle Oil Co. v. State of Mississippi ex rel. Knox, 277 U.S. 218, 48 S. Ct. 451, 72 L.Ed. 857, 56 A.L.R. 583, and assuming, without deciding, that the apparatus sold to the Coast Guard does infringe, and that the sale of it took place within the District of Maryland, nevertheless, any remedy that the plaintiff might have is exclusively against the United States by suit in the Court of Claims.

We believe that this conclusion is inescapable by the decision of the Supreme Court in Sperry Gyroscope Co. v. Arms Engineering Co., 271 U.S. 232, 46 S.Ct. 505, 70 L.Ed. 922. There a patent owner sued the manufacturer of gyroscopic compasses, alleging infringement and that they were made for, and sold to the United States Navy. The District Court dismissed the bill of complaint for want of jurisdiction under 35 U.S.C.A. § 68, the pertinent parts of which are as follows: "Whenever an invention described in and covered by a patent of the United States shall be used or manufactured by or for the United States without license of the owner thereof or lawful right to use or manufacture the same, such owner's remedy shall be by suit against the United States in the Court of Claims for the recovery of his reasonable and entire compensation for such use and manufacture. * * * In any such suit the United States may avail itself of any and all defenses, general or special, that might be pleaded by a defendant in an action for infringement, as set forth in this chapter, or otherwise." By virtue of section 238 of the Judicial Code (28 U.S. C.A. § 345) as it then read, a direct appeal was had to the Supreme Court, which reversed the ruling of the District Court, and held that (271 U.S. 232, at page 235, 46 S.Ct. 505, 506, 70 L.Ed. 922) "it became the duty of the court below to consider and determine whether, in the circumstances stated, appellee was relieved of liability and permitted by the statute to do what otherwise would have constituted a violation of appellant's rights," that is, the case was remanded to the District Court for

the purpose of having it determine by or for whom the alleged infringing devices were manufactured. Applying the principle there announced to the present case, we interpret it as meaning that this court has jurisdiction to determine whether or not the apparatus claimed to infringe was used by or manufactured for the United States. Plaintiff has not been taken by surprise, nor deprived of full opportunity to present adequate proof. The hearing was granted on the understanding that the question of direct acts, as well as indirect acts of infringement by the electric company, would be heard. The only evidence, as has been explained, offered with respect to direct acts of infringement, was the letter above mentioned. So, if the sales there referred to do not constitute such infringement, then there has been no such infringement, and thus there would be no further factual issue that this court would be required to decide with respect to this phase of the case. But, assuming that such evidence is sufficient to indicate possible infringement, the result is the same in so far as the right of the plaintiff to proceed further in this court is concerned, because, as has already been pointed out, since the Coast Guard is an agency or instrumentality of the United States, and since the only apparatus alleged to infringe was sold to and used by it, if not in fact expressly manufactured for it, plaintiff must seek redress in the Court of Claims, by virtue of the provisions of 35 U.S.C.A. § 68. In Richmond Screw Anchor Co. v. United States, 275 U.S. 331, 48 S.Ct. 194, 72 L. Ed. 303, this statute was interpreted and the Supreme Court held that where an invention is used or manufactured by or for the United States, the manufacturer is entirely relieved from liability and the patent owner has his sole remedy against the United States in the Court of Claims. Parenthetically, it may be noted that this decision, rendered subsequent to the Sperry Case, supra, does not refer to the Sperry Case, but it is not to be inferred from this fact that the later decision is to be treated as in any way modifying or qualifying the earlier one. The later case was begun, unlike the Sperry Case, in the Court of Claims by the owner of a patent suing the United States. Thus, the construction of the statute above referred to was brought directly and immediately in issue, which was not true with respect to the situation in the Sperry Case, there, the issue being as to whether the District Court had jurisdiction at all, be-

cause of the allegation in the complaint that the alleged infringing devices were made under contract with the government, the court saying (271 U.S. 232, at page 234, 46 S.Ct. 505, 506, 70 L.Ed. 922): "But for the allegation that the inventions were made and sold under such a contract [with the government], this would be but the ordinary patent suit. And so the real question presented is whether that allegation was enough to deprive the District Court of the jurisdiction plainly conferred by section 24 [Judicial Code, 28 U.S.C.A. § 41]."

█ We now turn to a consideration of the second question, namely, whether electric company has indirectly committed any acts of infringement within the Maryland district; or, stated in another form, whether that company and supply company are to be treated, for the purposes of the present suit, as separate and distinct corporations, or whether the facts require, on the issue of jurisdiction, that the corporate entity of supply company be disregarded, and that it be treated as merely an agent, instrumentality, or department of electric company.

The rule for determining when the corporate entity must be disregarded in cases of this sort is not capable of one succinct statement, applicable generally to all cases. For example, the fact that the parent company is the sole stockholder of the subsidiary is not of itself sufficient ground for disregarding the corporate entity of the latter. Cannon Manufacturing Co. v. Cudahy Packing Co., 267 U.S. 333, 45 S.Ct. 250, 69 L.Ed. 634; Mas v. Nu-Grape Co. (C.C.A.) 62 F.(2d) 113; Cleveland Trust Co. v. Consolidated Gas, Electric Light & Power Co. (C.C.A.) 55 F.(2d) 211; Owl Fumigating Corp. v. California Cyanide Co. (D.C.) 24 F.(2d) 718, affirmed (C.C.A.) 30 F.(2d) 812. The same is true with respect to interlocking directorates. See, in addition to the cases just mentioned, McLean v. Goodyear Tire & Rubber Co. (C. C.A.) 85 F.(2d) 150. Likewise, the fact that there are some officers common to both the parent and subsidiary is not a sufficient ground to disregard the latter's corporate entity. Mas v. Nu-Grape Co. and Owl Fumigating Corp. v. California Cyanide Co., supra. Again, it has been held that the identity of names [Owl Fumigating Corp. v. California Cyanide Co., supra] and offices in common [Gillis v. Jenkins Petroleum Process Co. (C.C.A.) 84 F.(2d) 74]

are not sufficient to warrant disregarding the subsidiary's corporate entity.

In order fully to understand the true effect of the decisions relating to this question, it is essential, upon approaching this question, to distinguish between the two classes of cases that are involved: (1) Those where the question is whether the corporation is "doing business" in a particular state; and (2) those which deal with substantive rights.

Under the first class, the question is purely one of entrance or nonentrance into the particular state. The corporation may have reasons, good or bad, for not subjecting itself to the state's jurisdiction. Tax burdens incident thereto may be a controlling factor. Therefore, the trend of decisions has been against extending the definition of "doing business," and in favor of a rather literal interpretation of the factual situation in each given case. For example, in the Cannon Case, supra, the defendant, a Maine corporation, marketed its products in North Carolina through a subsidiary, an Alabama corporation which it completely dominated through stock ownership and otherwise. Nevertheless, the Supreme Court held that the defendant corporation did not thereby do business in North Carolina so as to be present there and suable in the federal court. As the court said (Mr. Justice Brandeis, 267 U.S. 333, at pages 336 and 337, 45 S.Ct. 250, 251, 69 L.Ed. 634): "No question of the constitutional powers of the state, or of the federal government, is directly presented. The claim that jurisdiction exists is not rested upon the provisions of any state statute or upon any local practice dealing with the subject. The resistance to the assumption of jurisdiction is not urged on the ground that to subject the defendant to suit in North Carolina would be an illegal interference with interstate commerce. Compare International Harvester Co. v. Kentucky, 234 U.S. 579, 587–589, 34 S.Ct. [944] 947, 58 L.Ed. 1479. The question is simply whether the corporate separation carefully maintained must be ignored in determining the existence of jurisdiction.

"The defendant wanted to have business transactions with persons resident in North Carolina, but for reasons satisfactory to itself did not choose to enter the state in its corporate capacity. It might have conducted such business through an independent agency without subjecting itself to the jurisdiction. Bank of America v. Whitney Central National Bank, 261 U.S. 171, 43 S.Ct. 311, 67 L.Ed. 594. It preferred to employ a subsidiary corporation. Congress has not provided that a corporation of one state shall be amenable to suit in the federal court for another state in which the plaintiff resides, whenever it employs a subsidiary corporation as the instrumentality for doing business therein. ' * * * The corporate separation, though perhaps merely formal, was real."

Similarly, in the Nu-Grape Company Case, supra, a decision of the Circuit Court of Appeals for the Fourth Circuit, although all of the capital stock of the subsidiary was owned by the parent corporation; and although four out of five of the directors of the subsidiary were directors of the parent company, and the latter company dominated and controlled the actions of the former, in that the subsidiary was engaged in selling bottled beverages, and in handling certain other beverages as to which another subsidiary of the parent company had exclusive sales rights in the first subsidiary's territory, nevertheless, the Circuit Court of Appeals held that the business of the two companies was distinct, and that the parent company was not doing business within the meaning of section 48 of the Judicial Code (28 U.S.C.A. § 109), so as to authorize service of a subpœna upon subsidiary's agent as the agent of the parent company. The court said [62 F.(2d) 113, at pages 115, 116]: "There can be no question that appellee could not be held liable on a contract executed by the Mavis Company in its (the Mavis Company's) own name, and we do not think the proven circumstances justify the conclusion that the place of business of the Mavis Company in Lynchburg, was a 'regular and established place of business' of appellee within the meaning of the statute. * * *

"The right given by the statute is an unusual one not to be enlarged by construction."

The present suit clearly does not fall within this first class because electric company has itself qualified under the Maryland law to do, and is, in fact, doing business in Maryland. But the present suit does clearly fall within the second class of cases because substantive rights are involved.

Respecting this second class, it is equally difficult to give in one composite definition the rule that governs because the ques-

tion is factual in every instance. In a very recent case decided by the Circuit Court of Appeals for the Fourth Circuit, Certain-Teed Products Corp. v. Wallinger, 89 F. (2d) 427, a corporation owned a majority of the voting stock of an insolvent subsidiary and had the same officers and directors, and such holding company invoked the rule that these facts did not make it liable upon the obligations of the subsidiary or create the relationship of principal and agent between them, but, on the other hand, the receiver appointed for the subsidiary maintained that such stock ownership and control was resorted to not for the purpose of participating in the affairs of the subsidiary corporation in a manner normal and usual with stockholders, but for the purpose of making it a mere agent, instrumentality, or department of the holding company. Although the court held the holding company liable on another ground, in the course of its opinion it stated the rule in the following language, which must control us here (page 434): "'The difficulty attending the application of these broad statements [referring to the position taken pro and con the holding company above summarized] to particular facts has confronted the courts in numerous cases and has been the subject of extended discussion of text-writers as well. It is obvious that the extent of stock ownership and potential control possessed by the holding company is not the determining factor when its liability for the acts and obligations of the subsidiary are under consideration. Something more must be found—something of fraud, or illegality, or wrongdoing, productive of loss or injury to the complainant, to justify the courts, as they are wont to say, in disregarding the corporate entity of the subsidiary body; and it is because of the vague boundaries of this added essential element that it is well nigh impossible in the present state of the law to enunciate a clear cut rule. Powell on Parent and Subsidiary Corporations, c. 1; Latty on Subsidiaries and Affiliated Corporations, pp. 5, 41, 142, 143, and cases cited."

Prima facie, the argument is not without some persuasive force that a more strict adherence to the doctrine of not disregarding the corporate entity is justified, if not required, in cases falling within the first class, than it is with respect to cases of the second class, for the reason that in at least some of the latter cases, but in none of the former, the corporation sought to be held has already voluntarily subjected itself to the state's jurisdiction, that is to say, if it once voluntarily subjects itself to state requirements as to being present within the state, the law should be less loath "to draw the veil," so to speak, to look through form to substance. And so it may be argued with some force that since the jurisdictional statute, the interpretation of which is here in issue, section 48 of the Judicial Code (28 U.S.C.A. § 109) embraces within its provisions the equivalent of both of the jurisdictional requirements which we have been considering, namely, the requirement that the defendant shall (1) be doing business in the state, and (2) shall have done something involving a substantive right of the plaintiff, the rule should permit of greater disregard of the corporate entity. However, the parent company in the Certain-Teed Case was found, just as here, to have been doing business in the given state, even though the "double-barrelled" jurisdictional provisions of section 48 of the Judicial Code (28 U.S.C.A. § 109) were not actually involved, since it was not a patent case. Nevertheless, as emphatically set forth in that part of the opinion just quoted, in order to hold the parent company it was necessary to find "something of fraud, or illegality, or wrongdoing, productive of loss or injury to the complainant, to justify the courts, as they are wont to say, in disregarding the corporate entity of the subsidiary body."

In the Cannon Case, supra, 267 U.S. 333, at page 337, 45 S.Ct. 250, 251, 69 L.Ed. 634, the Supreme Court, following that part of its opinion already quoted, added: "There is here no attempt to hold the defendant liable for an act or omission of its subsidiary or to enforce as against the latter a liability of the defendant. Hence, cases concerning substantive rights * * * have no application."

These statements coming from both the Supreme Court and the Circuit Court of Appeals for the Fourth Circuit thus indicate that the rule applicable to the second as well as to the first class of cases which we are now considering is a rigid one in so far as the recognition of the separate corporate entities is concerned. Congress wrote into the statute which here controls us the conjunction "and." The courts cannot change it to "or." Severe as this statute may appear to the plaintiff, it is to be noted that it nevertheless affords a wider latitude for bringing patent suits

than does section 51 of the Judicial Code (28 U.S.C.A. § 112) for bringing civil suits generally.

Since, as we have seen, the facts of the present case prevent it from falling within the first class of cases just considered, it must fall in the second class and the rule relative thereto must be applied. It is true that the Certain-Teed Case, supra, was not a patent decision and it is also true that the rule there laid down as to when the corporate entity would be disregarded when substantive rights are involved was not actually necessary to the decision. Likewise, it must be admitted that no apposite decision of the Supreme Court, before or since the Cannon Case, supra, has been found, dealing with the question of patent infringement. However, in the case of Owl Fumigating Corp. v. California Cyanide Co., 24 F.(2d) 718, we find a decision with facts strikingly similar. There, two corporations, one, the parent chartered in Delaware, the other a subsidiary chartered in California, had identical names and officers, and the stock of the one was completely controlled by the latter. The subsidiary, the California corporation, was the operating company. The patents alleged to be infringed by this company and for which it was sought to hold the Delaware company, related to fumigation of trees and plants. In order to avoid the unnecessary expenditure of time and money in bringing witnesses from California to Delaware and taking their testimony upon the issues of validity and infringement, if the contention of the Delaware company were found to be correct, the parties agreed that upon completion of testimony touching the liability of the Delaware company for infringing acts of the California company, the trial should be suspended, the liability of the Delaware company determined, the bill of complaint dismissed, or the trial proceeded with as the finding of the court upon that issue should require. The trial court absolved the Delaware, the holding corporation, and this decision was affirmed by the Circuit Court of Appeals for the Third Circuit, 30 F.(2d) 812. Judge Woolley, speaking for that court, made a very lucid statement of the law. For this reason we quote at some length from his opinion (pages 812, 813), and we believe that the principle there announced is entirely consonant with the rule announced by the Supreme Court of the United States and by the Circuit Court of Appeals for the Fourth Circuit as already explained, and which is binding upon us in the present case: "The law which it [the plaintiff] invoked and applied to the facts is familiar and not open to dispute. It consists of rules which from the nature of the questions to which they apply are in the abstract, and are mainly negative in character. For instance, these rules declare that similarity or identity of corporate names does not alone disturb or bring together distinct corporate entities; that ownership of capital stock of one corporation by another does not alone create identity of interests or the relation of principal and agent between the two; that identity of officers does not alone establish identity of corporations and make one liable for the torts of the other; that the mere loan of money even in large amounts by one corporation to another does not alone make the borrower the agent of the lender or make the lender liable for the acts of the borrower; that participation by the lender in the management of the borrower's business for the purpose of protecting its debt does not make the lender liable for the borrower's debts. When, as against the general rule that two separately incorporated companies are separate and distinct entities, it is charged that one is a mere agency or department of the other and is used as an instrumentality to perpetrate fraud, justify wrong, avoid litigation or render it more difficult, or generally to escape liability for what are in substance its own acts, courts will put aside the screen and, looking upon the situation through the group of negative rules, determine affirmatively the truth and place responsibility where it actually belongs. In such a process, essentially mental, there is not infrequently ample space for divergent judgments. This is shown by the opposite yet very earnest and entirely honest views which the opposing parties in this case have taken of the facts in the light of the same law. With the law constantly in mind we have, because of the practical consideration involved in the plaintiff's attempt to recover from the Delaware corporation for alleged infringement, given to the record full and careful study. As no one other than the litigants are interested in the testimony we shall not recite or discuss it but express our judgment that it does not establish identity of the two corporations or identity of acts and mutual responsibility. The evidence does not show that the Delaware company

created the California Company for the purpose of infringing the plaintiff's patents or that, since its creation, there has been concerted action between the California company, charged, with having directly done the injury, and the Delaware company which is charged with committing the acts of infringement by authorizing, directing and controlling the acts and business of the California company, such concerted action between the two companies being necessary to establish joint acts of infringement and, joint and several liability. Thomson-Houston Electric Co. v. Ohio Brass Co. (C.C.A.) 80 F. 712.' For a more particular statement of the reasons that have moved us to this judgment we refer and subscribe to the reasoning of the learned trial judge in his opinion ([D.C.] 24 F.(2d) 718) and particularly to his statement of the law with the supporting authorities."

Other decisions confirming the same principle, although not dealing with patents, are the quite recent cases of United States v. Elgin, etc., Ry. Co., 298 U.S. 492, 56 S. Ct. 841, 80 L.Ed. 1300, and Cleveland Trust Co. v. Consolidated Gas, Electric Light & Power Co. of Baltimore et al. (C.C.A.) 55 F.(2d) 211; Duvall Co. v. Washington, B. & A. Electric R. Co. (D.C.) 51 F.(2d) 566.

Let us now analyze the material facts in the present case. Let us consider, first, those facts which, if weighed by themselves, might indicate that the corporate entity should not be disregarded; and then those facts which, considered by themselves, might indicate that an opposite result should be reached. Then let us determine which facts should be considered dominant, and whether they indicate the existence of "fraud, or illegality, or wrongdoing, productive of loss or injury to the complainant."

Under the first group, we find that supply company filed individual federal income tax returns, and that electric company did not file consolidated federal income tax returns including therein reports of the operations of supply company. Also, supply company filed separate state and municipal income tax returns. No contract exists between electric company and supply company, by which the latter must purchase any given quantity of apparatus over any stated period. Nor must supply company purchase such apparatus only from electric company, or from others only by the latter's consent. Supply company sells prod-

ucts, but in relatively small volume, other than those of electric company, and in competition therewith. Officers of supply company are not officers of .electric company, with the exception of the former's assistant secretary, who holds a minor position in the latter's accounting department. Supply company has a regularly constituted board of directors which meets quarterly, and it also holds regular stockholders' meetings. The president of supply company directs its management, its policies, employs those whom he desires, fixes their salaries, and is not dictated to with respect to these matters by any one employed by electric company. Supply company has its own bank account, and no one employed by electric company can draw against this account. Supply company buys its merchandise outright from electric company, and keeps its accounts with respect to these purchases in the same manner as it does with respect to purchases from other manufacturers. Supply company pays all of its own wages and operating expenses, determines what dealers it will sell apparatus to, and upon what terms, none of which is dictated or controlled by electric company.

Not all of supply company's stores sell apparatus of electric company, and in four places, namely, Newark, New York, Chicago, and Philadelphia, electric company's radios are sold by other concerns, supply company not selling in these areas because not considering it profitable so to do. Orders from dealers obtained by supply company go direct to it, and are filled from stock in supply company's warehouses, except with respect to carload orders which are shipped direct to dealers by electric company, but in all cases, supply company itself collects the purchase price. Supply company maintains its offices in the main office building of electric company in Bridgeport, Conn., and pays rent to electric company. Electric company's relations with supply company are precisely the same as the relations it had had with a totally separate company in Baltimore, which had been a distributor for electric company and in which electric company had no interest.

The radios sold by electric company to supply company are sold F.O.B. Bridgeport, Conn. In case of any loss or damage, supply company itself makes all claim for same. Supply company pays a tangible property tax on all merchandise in its ware-

houses. It, and not electric company, suffers the loss in the event of failure to collect from dealers, or in the event of defective goods, etc., and any over-stock is sold at a loss to supply company, and is not returned to electric company. Some 200 concerns, other than electric company, sell to supply company, and all accounts are kept alike. Supply company obtains no preferential treatment from electric company under the latter's contracts. For example, electric company sells auto radios to R. J. Loock & Co., Baltimore, in which electric company has no interest. Supply company also deals in auto radios, and orders of both the Loock Company and supply company are handled in precisely the same way by electric company. Electric company has some 127 distributors, of which approximately 100 are branches of supply company. Supply company cannot order radios through every office of electric company, but only through those which sell radio sets, or through electric company's Bridgeport office. From 1929 to 1935 there were no written contracts between electric company and supply company, but now the companies have formal, written contracts.

Turning next to those facts which, taken by themselves, would indicate that the corporate entity should be disregarded, we find that 9 out of a total of 13 directors of supply company are officers of electric company, 4 of whom are executive officers and 5 are connected with the latter's sales and merchandising departments. The president (also a director), the comptroller, assistant secretary, and secretary-treasurer of supply company were, prior to their employment as such, employed by electric company as appliance sales manager, as head of finance section, supply house department, in the accounting department, and as a district auditor, respectively. Electric company owns the entire capital stock of supply company. In the annual reports of the former, the earnings of the latter are not set out but those of other subsidiaries are. Supply company has not, on its own behalf, ever submitted any financial statements to the New York Stock Exchange or to the Securities and Exchange Commission, whereas electric company has filed with these bodies statements which do not separately state the assets and liabilities of supply company, but include them in one, consolidated statement.

Supply company has never sold any radios other than those of electric company since June 1935, the date when electric company began manufacturing radios. The sole purpose of organizing supply company was to distribute the products of electric company, as indicated by the latter's 1929 statement. In addition to sharing the cost of certain advertising with electric company, supply company, at its own expense, advertises, over its own name, electric company products. Supply company's offices are in the same building with those of electric company, which constitute part of the general plant of the electric company. The present suit was filed September 18, 1936, and supply company stopped selling electric company's radios in Newark in January 1937, in New York and Chicago early in 1936, and in Philadelphia early in the present year. At the present time in Newark, New York, and Chicago, electric company sells its radios through a factory branch, and in Philadelphia, through an electrical wholesaler. The department of electric company, in which the president of supply company was formerly employed, handled electric company's radios. No records are available to the public showing assets, liabilities, income, amount and cost of sales, and similar data respecting supply company. Merchandise sold by supply company in competition with the products of electric company are of small volume and of little importance. Supply company orders are given through its district managers directly to electric company, and the latter makes shipment directly to a district warehouse of supply company, unless on carload orders which are filled by direct shipment to the dealer, who pays supply company, and electric company, in turn, is paid by supply company. No separate record is kept in supply company's offices at Bridgeport of transactions covering any sales, but each week, a report of purchases and sales is sent by each district office of supply company to its Bridgeport office. Pursuant to contracts between supply company and electric company, sales quotas are fixed with respect to given territory.

The aforegoing analytical review of all of the material facts fails to disclose any evidence whatsoever of "fraud, or illegality, or wrongdoing, productive of loss or injury to the complainant," or any evidence from which an inference may reasonably be made that any such circumstance

existed. This being true, we are required to disregard any practical argument and hold that the two corporations, parent and subsidiary, must be treated as separate and distinct for the purposes of the present case. Plaintiff would have us extend the rule to meet the present case even though fraud, illegality, or wrongdoing is absent, because the parent corporation, electric company, having numerous subsidiaries, has chosen to distribute its products in Maryland through one of such subsidiaries, the policies of which it has the potentiality to control, although there is no credible evidence that it does exercise such control other than normal control exercised by stockholders with respect to the naming of directors who, in turn, name the administrative heads of the company and who themselves, in their turn, determine and make effectual the policies of such company. There is no evidence that electric company fixes the prices at which supply company should, or does, sell what it purchases from electric company; or evidence of other circumstances usually existing, when a disregard of the corporate entity is justified.

Plaintiff relies primarily upon the case of Industrial Research Corp. v. General Motors Corp., 29 F.(2d) 623, a decision of the District Court for the Northern District of Ohio which appears never to have been appealed. There, alleged infringement of patents was involved. This decision, if it be assumed that it is contrary to the rulings of the Supreme Court in the Cannon Case, supra, and the Circuit Court of Appeals for the Fourth Circuit in the Nu-Grape and Certain-Teed Cases, supra, cannot control. Whether it is, in fact, contrary to these cases is open at least to serious doubt because there the court found, contrary to the situation in the present case, that the policies and business of the subsidiary were wholly controlled and directed by the parent company. Furthermore, the Industrial Research Corporation Case was heard by the trial judge wholly upon the pleadings, namely, upon motions to quash the service, and upon supporting affidavits, whereas in the present case extensive testimony was taken and the precise facts developed. In this connection, the following quotation from the opinion of District Judge Killits, the trial judge in the Industrial Research Corporation Case, 29 F.(2d) 623, at page 627, is most significant: "In the cases cited a more extensive fact record was before the respective courts, in which records, severally, appeared proof of separation of the identities of the alleged corporate principal and agent, with a showing in the latter of rights of independent action and management, not only not here, but, due to the silence of the movants concerning such matters, peculiarly within their knowledge, if provable, they are presumed not to exist."

With respect to two other cases upon which the present plaintiff mainly relies, namely, Henderson v. Richardson Co. (C. C.A.) 25 F.(2d) 225, and Remington Rand Business Service v. Acme Card System Co. (C.C.A.) 71 F.(2d) 628, suffice it to say that these cases are clearly distinguishable. The first was a patent infringement suit in West Virginia against the Richardson Company, an Ohio corporation, Westinghouse Union Battery Company, a Pennsylvania corporation, Woodley, an Illinois citizen, and Iron, an inhabitant of the West Virginia District in which the suit was brought. Service was made upon Iron as agent for the Richardson Company and Westinghouse Company. The court held that there might be jurisdiction over Westinghouse if Iron were, in fact, proven to be its agent, and the case was remanded, in order that the exact facts might be ascertained. Clearly that decision cannot be conclusive of the present controversy.

In the Remington Rand Case the question of agency was not, in fact, involved, but simply whether the corporation in question had been maintaining in Maryland a regular and established place of business.

Numerous other cases have been cited to us, both on behalf of the plaintiff and the defendants. However, the facts in those cases clearly differentiate them and, besides, we think that enough has already been said to indicate that we believe the rule which must be applied in the present suit has been clearly and definitely defined, both by the Supreme Court and by the Circuit Court of Appeals for the Fourth Circuit.

Viewing plaintiff's position, therefore, in its legal aspect as we must, it is untenable and cannot be made tenable by practical considerations, however weighty such may appear to be. But are they, in fact, as weighty as plaintiff would have us believe? Multiplicity in litigation should, of course, always be prevented when possible, consistent with established legal principles. Also, it is particularly true with respect

to patent litigation that it is conducive to more prompt and more just decisions if suits involving the same issues can be consolidated, rather than have related litigation prosecuted in a variety of jurisdictions commencing and ending at divers times. Plaintiff asserts that in such cases as the Cannon Case, supra, the measure of recovery is not dependent upon retaining jurisdiction over the holding company; that the only advantage plaintiff there sought by having the court do so, was the assurance that the plaintiff would actually recover everything to which the court might hold it was entitled, and that in the absence of showing that the subsidiary company was insolvent or was not able to meet the court's judgment, the plaintiff was not jeopardized if jurisdiction over the parent corporation was not taken. However, plaintiff maintains that in the present suit the measure of its recovery is dependent upon retaining electric company in the suit; that plaintiff is entitled either to the profits made by the defendants or the damages suffered by it by reason of the infringement, and that plaintiff need not elect which it will rely upon until the accounting discloses which is the larger, and that such cannot be determined until after an accounting shows which one of the two defendants has made the major portion of the profits, and that, therefore, if plaintiff elected to sue but one, it might find after the accounting that its recovery was but nominal, because the other corporation was the one which had the real profits. Plaintiff would then be compelled to file a new suit or suits to recover the profits of such other corporation, which would not only result in the costly burden of separate, additional litigation, but would cost plaintiff the loss of profits which the defendant in the second suit might have experienced prior to six years before such additional litigation were begun.

Practically speaking, there is weight to these considerations but, likewise, there are certain practical considerations which weigh greatly in favor of electric company. Plaintiff can obtain jurisdiction over it in New York, the state of its incorporation, or in Connecticut, where the alleged infringing apparatus is manufactured and sold, and where it has a regular and established place of business, and perhaps elsewhere. Thus, as a practical matter there is no sound reason why electric company, whose records, witnesses and counsel, are in New York, should submit to a suit in the District of Maryland and undergo the burdens incident thereto, if not actually required by law so to do, except that here an earlier trial might be had. But this argument is purely one of convenience.

Plaintiff having failed to establish that electric company has committed any acts of infringement within the District of Maryland, this court is without jurisdiction to entertain suit against that company and, therefore, the bills of complaint will be dismissed as to it, without prejudice to suit by the plaintiff in the proper jurisdiction.