## UNITED STATES v. WHITE SULPHUR SPRINGS, Inc., et al.

### No. 250.

District Court, S. D. West Virginia.

Sept. 21, 1944.

Fitzpatrick, Strickling & Marshall, of Huntington, W. Va., and H. W. Oppenhimer, of Richmond, Va., for Chesapeake & Ohio Ry. Co.

Rathbone, Perry, Kelley & Drye, of New York City, for Central Hanover Bank & Trust Co., as trustee.

MOORE, District Judge.

The question presented here is: Shall the award of $3,300,000 made in the condemnation of the property of White Sulphur Springs, Incorporated (hereinafter called "White Sulphur"), be paid to the Chesapeake and Ohio Railway Company (hereinafter called "Railway") as grantee under a deed dated October 16, 1942, con-

veying all White Sulphur's property to Railway; or, shall it be paid to Central Hanover Bank and Trust Company (hereinafter called "Trustee"), the Trustee under Railway's general mortgage dated February 23, 1892?

The condemnation proceeding was instituted on September 29, 1942, and immediate possession was taken by the United States under an order of this court on September 30, 1942. On October 16, 1942, White Sulphur, whose sole stockholder was Railway, conveyed all its property to Railway, which assumed all of White Sulphur's liabilities. White Sulphur was dissolved as a corporation on October 20, 1942, and on December 28, 1942, by order of this court, the fee simple title to virtually all the real estate and personal property formerly owned by White Sulphur was vested in the United States. The award of $3,300,000 was paid by the United States into the registry of this court. Later, by a supplemental petition, Trustee was made a party, the United States alleging that Railway's general mortgage was a lien on White Sulphur's property. Trustee on November 1, 1943, filed an answer asserting that the amount of the award should be paid to it because of the alleged existence of a lien under Railway's general mortgage.

Trustee's contentions are:

(1) That the fact that White Sulphur, a corporation organized by Railway for the purpose of acquiring and operating the White Sulphur properties, acquired and operated them in its own name did not, as between Railway and Trustee, prevent the mortgage lien from attaching to those properties, to the same extent as if actually owned from the beginning by Railway; and

(2) That by the after-acquired property clause of Railway's general mortgage the White Sulphur properties, considered as being owned from the beginning by Railway, were subject to the lien of the general mortgage.

Railway contends:

(1) That the character of the White Sulphur properties was not such as to subject them to the lien of the general mortgage under the after-acquired property clause; and

(2) That even though White Sulphur was a wholly owned subsidiary of Railway, formed for the express purpose of acquiring and operating the White Sulphur properties, yet no reason exists for disregarding the separate corporate entity of White Sulphur, even as between Railway and Trustee, because there was no fraud, either actual or constructive, in connection with the whole transaction.

In my opinion, both of Railway's contentions must be sustained.

Railway's general mortgage was executed in the year 1892. The Acts of the General Assembly of Virginia of December 22, 1891, Acts 1891–92, c. 19, after authorizing the acquisition and construction by Railway of extensions to its railway system, gave it authority to issue bonds for the "further improvement, extension, and acquisition of railroads, rolling stock, and other fixtures, in order to furnish adequate accommodations for the growing business of the company," which bonds were authorized to be secured by deeds of trust or mortgages "upon the railroad property and franchises of the corporation, or any part or parts thereof." There was also a prior Act of December 18, 1889, Priv. Acts 1889, c. 2, which authorized and empowered Railway "to secure any indebtedness that * * * may be incurred * * * in the course of its business, by deeds of trust or mortgages upon its works or property, or upon any part thereof * * *."

On February 23, 1892, the stockholders of Railway authorized the execution of the general mortgage. One of the resolutions passed for that purpose contains the language "that the Board of Directors be, and they are hereby authorized and empowered to create a new mortgage on all the existing property of the company, and such additional property as may hereafter be acquired with the proceeds of bonds issued under said mortgage * * *."

The pertinent provisions of the general mortgage relating to after-acquired property are, after specifically describing and conveying certain lines of railway with their appurtenances: "(e) Together with all its franchises, rights, and privileges appurtenant to or used in connection with the lines or railway and extensions and branches hereinbefore described, including buildings, depots, stations, warehouses, and docks, and including and intending to include in these presents the roadbed, superstructure, and the right of way, rails, tracks, side-tracks, bridges, viaducts, car-

houses, engine-houses, freight-houses, wood-houses, warehouses, machine shops and other shops, turn-tables, water-stations, fences, structures, erections, fixtures and appurtenances, and all other things of whatever kind thereunto belonging or in anywise appertaining to said lines of railway and extensions and branches above described, which have been or may be at any time hereafter acquired or provided for use upon or in connection with the said lines of railway and extensions and branches above described, and all lands now acquired, designed for depots, warehouses, and other structures at any terminus or along the said lines of railway or extensions or said branches; and also all the locomotives, engines, cars, and other rolling stock, equipment, machinery, instruments, tools, implements, material, furniture, and other chattels now belonging or appertaining to said railway and extensions and branches above described; and all leaseholds, leases, rights under leases, or under contracts, covenants and agreements, terms or parts of terms, now held or hereafter acquired, property, both real and personal, or every kind and description, now owned or hereafter acquired, for use upon or in connection with or for the purpose of the said lines of railway and extensions and branches above described, and all corporate rights, privileges, and franchises which the said Railway Company has and can exercise or shall hereafter acquire or possess, or, in, to, upon, or in respect of the said lines of railway and extensions and branches or any part thereof or necessary for the construction, maintenance, or operation of said lines of railway and extensions and branches, or which may hereafter belong or appertain to the same or any part thereof, and all the rents, issues, profits, tolls, and other income of the said lines of railway and extensions and branches, and all the rights, privileges and franchises, properties, real and personal, and rights and things which the said Railway Company may or shall hereafter possess or become entitled to for the purpose of or in connection with the said lines of railway and extensions and branches above described, or in the operation, use, and maintenance thereof."

It is also observed that by the granting clause of the mortgage there are conveyed, as stated in one place, "all other extensions, branches, and other property of every kind and description * * * which the Railroad Company has constructed, acquired, or may hereafter construct or acquire from or by the use of the proceeds" of certain bonds; and in another place, "all lines of railway extensions, branches, stocks, bonds and other property of every kind or description * * * which the Railway Company may hereafter construct or acquire from or by the use of the proceeds of" certain other bonds. None of the money invested by Railway in White Sulphur was derived from the proceeds of any bonds secured by the general mortgage.

White Sulphur Springs was a famous watering place, whose history reaches back to the year 1778. It was a place of resort for health and pleasure by persons residing all over the southern and eastern section of the United States. The hotel built there was at one time the largest in the South. The main line of the Chesapeake and Ohio Railroad Company, of which company Railway is the successor, was constructed through White Sulphur Springs close to the hotel which was the center of the resort, and for many years prior to the acquisition of the property by White Sulphur visitors to the Springs made use of the passenger accommodations of Railway for travel to and from that place.

About the year 1909, officials of Railway negotiated with the then owners of the White Sulphur properties for their purchase. A corporation (White Sulphur Springs, Incorporated) was organized to take over these properties. With the exception of seven qualifying shares issued to directors, which were shortly afterwards acquired by Railway, Railway at all times was the sole owner of all the capital stock of White Sulphur. Railway advanced the money to buy the properties, which advances were secured by a deed of trust thereon. These advances were later repaid, and the deed of trust was released. Railway, however, continued to advance money to White Sulphur, sometimes for stock and at other times taking notes. All such advances were made from free cash of Railway, and there is nothing in the record to indicate that any of the advances made by Railway have not been repaid.

Ever since its acquisition by White Sulphur, the property, until condemned in this proceeding, has been managed and operated purely as a resort hotel, whose facilities have been progressively improved and en-

larged. White Sulphur's business was carried on as a separate and distinct commercial project; sometimes it was operated at a deficit, but at other times, especially during its later years, it produced substantial profits. Its only connection with Railway, other than the fact that Railway was the owner of all its stock and advanced it money when needed, seems to have been that the hotel was a profitable source of revenue, due to the large number of guests who were constantly coming and going in Railway's passenger trains, together with large shipments of supplies to the hotel and to the town which had been built up around it as the center.

As already stated, none of Railway's funds which were advanced to White Sulphur, and used in acquiring, maintaining, and operating the White Sulphur Springs properties were derived from the proceeds of any bonds secured by the general mortgage. The argument put forward by the Trustee that the proceeds of these properties should be treated as a substitution for other properties covered by the general mortgage finds no logical support. Unless the character of these properties is such in itself as to bring them within the express terms of the mortgage, they cannot be drawn in under any demonstrable theory. They must be shown to have been acquired "for use upon, or in connection with, or for the purpose of" the lines of railway, or "in the operation, use, and maintenance thereof;" otherwise they are exempt.

■ At the outset we are confronted with the principle that after-acquired property clauses in mortgages must be interpreted and construed strictly in favor of the exemption of after-acquired property therefrom. "The terms employed in describing the property mortgaged must 'imperatively demand' the construction contended for." Cleveland Trust Company v. Consolidated Gas, etc., Co., 4 Cir., 1932, 55 F.2d 211, 214.

■ Clearly the stockholders of Railway, who authorized the mortgage, did not intend that it should cover after-acquired property other than that acquired with the proceeds of bonds issued under the mortgage. It is equally clear from the language of the general mortgage taken as a whole that the after-acquired property clauses were intended to cover only such classes of property as were to be used upon, or

in connection with, or for the purpose of the lines of railway, or in their operation, use, and maintenance. The Trustee argues that such after-acquired property need not be necessary for the operation of Railway, but that it is sufficient to show that it was convenient to Railway, and that its use as a resort hotel resulted in increasing the volume of Railway's business. I am not impressed with this argument. In the case of Guaranty Trust Company v. Minneapolis & St. L. R. Co., 8th Cir., 1929, 36 F.2d 747, 752, the court announced the rule to be followed in the construction of after-acquired property clauses in railroad mortgages: "* * * As applied to railroad property, in order that after-acquired property may be embraced in a mortgage, describing such property in general terms, the property must be such in character as appertains or is appurtenant to the road, and is necessary to the enjoyment of the franchise or operation of the road, and, if it is not such property, then there must be a specific description of it in the mortgage."

■ Many cases hold that property is not appurtenant to a line of railroad unless it is a necessary appendage thereof. Mere convenience is not enough. See Bank of Commerce v. Tennessee, 104 U.S. 493, 26 L.Ed. 810; Humphreys v. McKissock, 140 U.S. 304, 11 S.Ct. 779, 35 L.Ed. 473. There is no suggestion in the testimony that the White Sulphur properties were ever used as appurtenances to Railway's lines, or in fact to any phase of Railway's operations. Granting that the maintenance of the hotel resulted in an increase of Railway's passenger and freight business, still it was not in any sense necessary to that business. It was simply a resort hotel and was always owned, used, and maintained for that purpose, and that alone.

I am of opinion, therefore, that none of the properties of White Sulphur were subject to the lien of Railway's general mortgage.

Having reached the conclusion that the White Sulphur properties were not subject to the lien of the general mortgage on after-acquired property, regardless of their ownership, I need devote little space to a consideration of Trustee's second contention, namely, that the corporate entity of White Sulphur should be disregarded, and the properties deemed to be the properties of Railway. However, as I have said,

this contention is not sustained by the testimony.

 In order to brush aside the separate entity of White Sulphur and treat it as a mere instrumentality of Railway for the purpose of subjecting its properties to Railway's general mortgage, it must appear that it was organized for a fraudulent purpose, or that injury has resulted to some one from the transaction. Neither of these elements is present here. Admittedly, White Sulphur was organized for the sole purpose of acquiring properties in which Railway had become interested, and whose purchase and operation Railway had determined to finance; but the entire transaction was, so far as the record shows, devoid of any attempt at concealment, and no purpose was shown, or even implied, to do any act or to accomplish any result which might in any way lessen the security or impair the rights of the bondholders. Only free cash was used by Railway. The business of the two corporations was kept entirely separate. Railway's property which is security for the bondholders under the general mortgage has continuously enhanced in value. It is not sufficient in order to show fraud that the two companies have common officers and directors, with complete stock ownership vested in Railway, and that Railway has made steady advances of money to White Sulphur. As Judge Coleman said in Hazeltine Corp. v. General Electric Co., D.C. Md.1937, 19 F.Supp. 898, 902: "Something more must be found—something of fraud, or illegality, or wrongdoing, productive of loss or injury to the complainant, to justify the courts, as they are wont to say, in disregarding the corporate entity of the subsidiary body."

The trustee did not introduce any testimony. It relies upon the avowed purpose of Railway in organizing White Sulphur to conduct the transaction in such a way that the lien of the general mortgage would not be a lien on White Sulphur properties, as an admission of fraudulent intent. But this was a legitimate aim and purpose so long as the bondholders were not injured thereby. Evasion of a just obligation is one thing; avoidance of the possibility of incurring an obligation is quite another thing. The former may present a case of actual or constructive fraud; the latter is fraudulent only if an illegal or injurious purpose appears. No such purpose is shown by the evidence in this case.

An order may be entered denying the Trustee's claim to the award of compensation made for the White Sulphur properties, and confirming delivery thereof to Railway.